No. 73–1728. DUNN *v.* IMMIGRATION AND NATURALIZATION SERVICE. C. A. 9th Cir. Certiorari denied.

MR. JUSTICE STEWART, with whom MR. JUSTICE DOUGLAS joins, dissenting.

Petitioner seeks review of the Service's order deporting him to Canada, his nation of citizenship. The Ninth Circuit noted that the Service's "discretion . . . might have been exercised with greater compassion," but none-

---

theless upheld the order on the theory that "the scope of . . . review in this area is extremely narrow."

The facts are peculiar; or, more accurately, the Service's action is peculiar in light of the facts. Moving to this country with his parents in 1953 (at age 9), petitioner acquired permanent resident alien status. As such, he was subject to the draft, 62 Stat. 605, as amended, 65 Stat. 76, 50 U. S. C. App. § 454 (a), and he duly registered on his 18th birthday. In August 1966, he was ordered to report for induction on September 28, 1966. Possessing strong views against war and conscription, petitioner decided to go to Canada, rather than serve. At the border, he turned in his Alien Immigration Card but expressly refused to sign a formal renunciation of his permanent resident status. Very quickly, he thought better of his decision to leave. On September 28, his induction date, petitioner telephoned his draft board to announce that he was returning to the United States to surrender to a United States Attorney and to accept the legal penalty for refusing induction. On October 3, 1966, petitioner flew to Chicago and turned himself in to the United States Attorney. The Government took no action for 21 months, during which time petitioner studied at an American university.

Finally, in July 1968, petitioner was indicted under 62 Stat. 622, 50 U. S. C. App. § 462 (a), for "evad[ing] or refus[ing] . . . service in the armed forces." He pleaded guilty and was sentenced to six months' imprisonment and 18 months' probation, the latter conditioned on his doing civilian work of national importance. Petitioner served this sentence in full.

Two years later, the Service moved to deport him, on grounds that he had fled the country to evade the draft, 66 Stat. 184, 8 U. S. C. § 1182 (a)(22), and abandoned his immigrant status in the process, 66 Stat. 183, as amended,

79 Stat. 918, 8 U. S. C. § 1182 (a)(20). This was a surprise, for petitioner thought that the books on this matter had been balanced by his voluntary return to the United States, surrender to authorities, guilty plea, and service of sentence. The Service found that no Government official ever promised petitioner that such would be the case. Still, the reasonableness of petitioner's impression is clear enough. Prevailing law afforded aliens an exemption from Selective Service liability if they were willing to forfeit permanent resident status and any chance at eventual citizenship, 62 Stat. 606, 50 U. S. C. App. § 454 (a) (1964 ed.). Exercising this option meant an almost certain loss of an alien's right to remain in this country. Rather than exercise this option, petitioner accepted draft law liability, and the Government solemnized his choice with prosecution, conviction, and punishment under the draft laws. Now the same Government, in the guise of the Immigration Service, wishes to disregard his earlier choice, and the burdens imposed incident to it, and to deport petitioner as if none of this had happened. In my view, the two legal grounds asserted to support deportation do not overcome the obvious injustice of the order.

*First:* The Service found petitioner deportable for having re-entered the country, after his flight to Canada,

> "not in possession of a valid unexpired immigrant visa." 8 U. S. C. § 1182 (a)(20).

The theory is that petitioner abandoned permanent resident status, and thus his visa, when he turned in his alien card at the border. Standing alone, this theory would not be unreasonable. But I cannot square it with the fact the Government prosecuted petitioner for breaching an induction order premised on his status as a permanent resident. At the time, nonresident aliens were also subject to the draft, but only after remaining "in the United

States in a status other than that of a permanent resident for a period exceeding one year." 50 U. S. C. App. § 454 (a) (1964 ed.). If petitioner lost his permanent resident status at the border, his return would not have made him "liable for training and service in the Armed Forces" under § 454 (a) until a year later, and certainly that new liability would have required a new induction order.

By submitting his case promptly and in orderly fashion to the United States Attorney, petitioner rightfully expected a responsible examination of his case by the Government. In my judgment, the decision to prosecute, nearly two years later, implied Government adherence to the view, held by petitioner then as now, that his permanent resident status, and thus the legal premise of the induction order, had not been undermined by his brief démarche in Canada. Having led petitioner through the rigors of indictment, conviction, and punishment on this theory, the Government should now be precluded from changing its mind. Cf. *Raley* v. *Ohio,* 360 U. S. 423 (1959); *Cox* v. *Louisiana,* 379 U. S. 559 (1965).

*Second:* The Service also found petitioner deportable for having

> "departed from or . . . remained outside the United States to avoid or evade training or service in the armed forces in time of war or a period . . . [of] national emergency." 8 U. S. C. § 1182 (a)(22).

The obvious purpose of § 1182 (a)(22) is to deny admission to the United States to aliens who have used foreign asylum to escape their liabilities under the draft law. It would appear that the provision reads in the disjunctive—"departed from or . . . remained outside"—so as to reach not only those who leave the country when faced with induction orders and fail to return to comply with them in time, but also those who receive their orders while already abroad and refuse to make timely return.

The Service reads the provision more broadly, so as to apply to any alien who departs with evasive motives, regardless of his subsequent conduct. This reading is implausible: It would prevent return of such an alien for the express purpose of reporting for induction on time. I cannot believe Congress intended the provision to apply to an alien who flirted with the idea of asylum but then made prompt return to face the music. It is true that petitioner's actual return occurred five days after his induction date. But he phoned the draft board on that date, announcing his intent to re-enter and turn himself in, an intention he carried out promptly. On these facts, I could not find that his purpose in "remain-[ing] outside the United States" for those five days was "to avoid or evade training or service."

Finally, it has been suggested that petitioner is none-theless deportable as a convicted felon. But the Service did not base the deportation order on this ground, and I doubt that it could. Under 66 Stat. 204, 8 U. S. C. § 1251 (a)(4), an alien is deportable if

> "convicted of a crime involving moral turpitude within five years after entry and either sentenced to confinement or confined therefor in a prison or cor-rective institution, for a year or more."

It is far from clear that refusing induction is a "crime involving moral turpitude." Cf. *Chaunt* v. *United States,* 364 U. S. 350, 353 (1960) (breach of peace not such a crime because "fraudulent conduct" not involved). To be eligible, the statutory crime must necessarily "in-volv[e] moral turpitude." *E. g., Ablett* v. *Brownell,* 240 F. 2d 625; *United States ex rel. Giglio* v. *Neelly,* 208 F. 2d 337; *United States ex rel. Guarino* v. *Uhl,* 107 F. 2d 399. It is feasible, and hardly uncommon, for induction to be refused on grounds which, while legally insufficient, dem-onstrate no moral fault. Moreover, it is unclear, at least

on the record before us, that petitioner's crime was committed within five years of an "entry" into the United States. Brief trips abroad by permanent resident aliens do not always result in a new statutory "entry." See *Rosenberg* v. *Fleuti*, 374 U. S. 449 (1963); *Vargas-Banuelos* v. *INS*, 466 F. 2d 1371. As noted above, the Service is hardly in a position to find an abandonment of permanent resident status by petitioner during his brief stay in Canada.

Because the factual setting of this case is unusual, the legal questions raised are unlikely often to recur. While this is normally a sound reason to deny review, the judgment before us is grossly unjust. The Service has noted that petitioner has a "penchant for botching up his life." Perhaps so, but the Government's botching up of this case has served to complete the wreckage.

I would grant certiorari and summarily reverse the judgment.