# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 04-1962

SELEMAWIT F. GIDAY,

*Petitioner*,

v.

ALBERTO R. GONZALES,

*Respondent.*

———————

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A95-395-594

———————

ARGUED JANUARY 11, 2005—DECIDED JANUARY 5, 2006

———————

Before POSNER, MANION, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Selemawit Giday requests asylum in this country, claiming that the government of the country of Eritrea, where she was born and raised, persecuted her due to her mixed Ethiopian and Eritrean ancestry. An immigration judge deemed her testimony not credible and found, in the alternative, that she had failed to establish that she met the criteria for refugee status. The Board of Immigration Appeals (BIA) affirmed and adopted the opinion below rejecting Giday's appellate claim that the immigration judge below had denied her due process of law. Because, among other reasons, we find that the immigration judge's credibility determinations were not supported

by cogent reasons bearing a legitimate nexus to the finding, we reverse and remand this case for further proceedings.

**I.**

Giday's tale of mixed ancestry is a familiar one. Having been born and raised in Eritrea, Giday considers herself Eritrean. During Eritrea's conflict with Ethiopia, however, Giday alleges, her partial Ethiopian ancestry (her mother is Ethiopian and her father Eritrean) subjected her to persecution by the Eritrean Government. Giday applied for asylum on January 23, 2002, approximately six months after arriving in the United States. The government initiated removal proceedings on March 25, 2002. At her removal hearing on May 22, 2002, she testified that she was born in 1979 in Asmara, Eritrea to an Eritrean father and an Ethiopian mother. After her father's death in 1985, when Giday was six, her Ethiopian mother supported Giday and her two brothers by operating a restaurant in Asmara, Eritrea. Giday performed one year and eight months' mandatory service in the Eritrean national service in 1996, and in June 1998, the national service provided her with an identification card noting her Eritrean nationality.

In 1998, heavy fighting broke out between Ethiopia and Eritrea. The government of Eritrea announced that people of Ethiopian ancestry could no longer operate businesses and had to leave the country. According to Giday, in May 1998, despite completing her earlier national service, government officials again called her to serve. She explained to the national service officers that she was attending school and soon to be married. The government officers told her, "when we need you, you should be able to go with us." She testified that she was able to avoid serving by moving from her mother's house to her fiance's house whenever she heard word that government officials were on their way.

Giday further testified that on September 12, 1999, the city police appeared at her Ethiopian mother's restaurant and ordered it closed. Within two weeks, the police, pursuant to an order by the Eritrean government, arrested Giday's mother and deported her to Ethiopia. Around the same time, Giday's brothers were conscripted into the national service and Giday stated that she has not heard from either her mother or brothers since that time.

In September 2000, the Eritrean government took Giday into custody and placed her in a detention facility for Ethiopians awaiting forced deportation. Giday initially testified that she was detained because her mother was Ethiopian and also because she had failed to serve in the national service a second time. She later testified that she was detained solely because of her Ethiopian ancestry. Her written statement, attached to her application for asylum does not identify specifically why she thought she was detained but states only that after she was arrested, she "was told that [she] would be deported and was placed in a jail with other Eritreans of Ethiopian descent." (R. at 210).

According to Giday, the detention center was crowded, hot, dirty, and the officers permitted Giday and her fellow detainees to use the bathroom facilities only two times a day. While there, she had no opportunity to present her case to a judge or otherwise to object to her detention and deportation. Giday's asylum application stated that she was beaten there, although during her hearing she testified only that she was "pushed around." Two days before she was scheduled for deportation, her husband—an Eritrean—managed to secure her release by bribing prison guards. Giday's husband secreted her into a waiting car, across the Sudanese border, and from there she entered the United States. She claims she has never been to Ethiopia, does not speak the language, and that she cannot return to Eritrea because the Eritrean government stripped her of citizenship when she was arrested and detained.

At the conclusion of her removal hearing, the immigration judge found Giday's testimony not credible. Even were it credible, he continued, she failed to bear the burden of demonstrating that she was a refugee—that is, that she had faced past persecution or had a well-founded fear of future persecution because of her mixed Ethiopian and Eritrean ancestry. Consequently, he found her removable as charged, denied her application for asylum, denied her application for withholding of removal and protection under the Convention Against Torture, and ordered her removal to Eritrea.

On appeal, the BIA adopted and affirmed the oral decision of the immigration judge and added its own findings regarding her claim. The BIA stated that "[a]lthough the respondent may have demonstrated that she experienced past persecution, we take administrative notice of the fact that conditions for most people of Ethiopian extraction have changed substantially for the better in Eritrea since the time of the respondent's experiences there," and found, consequently, that the presumption of future persecution had been rebutted. (R. at 2-3). In response to Giday's claim that the immigration judge had denied her due process with his frequent interruptions and badgering cross-examination, the BIA found that the judge had been assertive, but not offensive, and noted that Giday had made no record of protest during the proceedings below.

## II.

Where the BIA affirms and adopts an immigration judge's order, the decision of the immigration judge constitutes the final agency determination for purposes of our review. *Hussain v. Gonzales*, 424 F.3d 622, 626 (7th Cir. 2005). In this case the BIA both affirmed and adopted the decision of the immigration judge and appended to that determination a ruling regarding Giday's due process challenge and its own statement regarding Giday's credibility and likelihood of future persecution. Consequently, we review both the immigration judge's decision and the additional reasoning of the BIA. *See Voci v. Gonzales*, 409 F.3d 607, 612-13 (3d Cir. 2005); *Kataria v. INS*, 232 F.3d 1107, 1112 (9th Cir. 2000).

Giday argues first that the immigration judge violated her right to due process when he engaged in abusive, sarcastic, and overbearing cross-examination. His questions, she argues, inhibited direct examination and hindered her from testifying fully and accurately. The question of whether an asylum hearing comported with the requirements of due process is purely a legal one which we review *de novo. Rodriguez Galicia v. Gonzales*, 422 F.3d 529, 536 (7th Cir. 2005).

The Fifth Amendment entitles aliens to due process of law in deportation proceedings. *Reno v. Flores*, 507 U.S. 292, 306 (1993). Due process requires that a court afford an applicant a meaningful opportunity to be heard and a reasonable opportunity to present evidence on her behalf. *Rodriguez Galicia*, 422 F.3d at 538. Recently we had the opportunity to consider what constitutes "a meaningful opportunity to be heard," and concluded that "we must determine whether, given the totality of the circumstances, the petitioner had a full and fair opportunity to put on her case." *Id.* at 538. In *Rodriguez Galicia* we expressed deep concern when the immigration judge frequently interrupted testimony, appeared to be hostile to the petitioner, and engaged in active, "de-facto cross-examination" as though

he were counsel for the government rather than a neutral arbiter. *Id.* at 539. *See also Kerciku v. INS*, 314 F.3d 913, 918 (7th Cir. 2003) (finding that an applicant's due process rights were violated where the judge continually interrupted testimony and took over questioning); *Podio v. INS*, 153 F.3d 506, 510-11 (7th Cir. 1998) (concluding that the applicant was denied a fair hearing where the immigration judge frequently interrupted and took over questioning). The *Rodriguez Galicia* panel did not need to decide definitively whether the judge's overly-active role in the presentation of the testimony denied the asylum applicant due process of law, as the immigration judge had imposed other barriers to testimony that made clear the due process violation. *Id.*

Having reviewed the transcript of the hearing in *Rodriguez Galicia*, we note that the judge's active questioning in that case pales in comparison to the case before us now. In this case the immigration judge asked Giday approximately seventy-three questions. In comparison, her own attorney asked her approximately eighty-seven questions (only about 14 more) and the government lawyer only four.[1] Of course a large volume of questions alone does not create a due process violation, but in this case the immigration judge charged into the fray, cross-examining Giday about even the most mundane facts of her life story. For example, within the first few minutes of questioning the following confrontation occurred:

   Q. by the immigration judge:

---

[1] Toward the end of the proceeding the immigration judge interrupted his questioning to allow for a tape change. When the transcript resumes the judge says, "[t]his is tape four . . . . The Government's attorney was questioning the respondent." (R. at 106). The transcript, however, reveals no previous questions from the government—leading us to believe that some portion of the hearing was not recorded by tape or transcript.

. . . how old were you when your father died, ma'am?

A. I was six years old.

Q. So, sometime around 1985?

A. I would say, yes. I don't remember exactly, but I was, I was very young at that time when he died.

Q. You were born in 1979, correct?

A. Yes, I was born in '79.

Q. So, if you were six years old, would that have been sometime around 1985 when your father died?

A. It could be. Yes, it could be that time.

Q. What do you mean it could be? Don't you know when your father died?

A. At that time, I was six years old when he passed away.

Q. So that would have been around 1985?

A. Yes.

(R. at 76).

We do not find it nearly as odd as the immigration judge did that Giday might remember precisely how old she was when her father died, but not have the capacity to do the arithmetic to calculate what year he died. This is precisely the type of insensitivity to cultural differences or educational abilities about which we expressed concern in *Iao v. Gonzales*, 400 F.3d 530, 534 (7th Cir. 2005).

Of course we recognize that it is primarily the immigration judge's province to evaluate evasiveness. *Korniejew v. Ashcroft*, 371 F.3d 377, 386 (7th Cir. 2004). Nevertheless, the transcript makes clear that at times, Giday was not

purposefully evading questions, but rather the problem lay
in translation error.[2] For example, when the immigration
judge asked, "[h]ow do I know your mother is Ethiopian?"
the following exchange of non-sequiturs ensued: "They do
know her that she's somehow popular, she owns a restau-
rant, and people knows her who comes to her restaurant.
And, even though, during referendum even if they give
them an identification or a right to vote, after that they
start to find out who is Ethiopian and who is Eritrean." (R.
at 81). The judge responded, "Maybe they know, but how do
I know?" *Id.* Similarly, when Giday became flustered by a
confusing question, the judge simply gave up and found
Giday not credible:

> Q by Judge.   Ma'am, I have played the tape back, and
> you definitely stated that the reason they
> arrested you, because they told you your
> mother was Ethiopian, and they said you
> did not serve in the national army. You
> heard the tape I played back for you,
> didn't you?
>
> A.            Yes, I did.
>
> Q.            Do you have an explanation why you said
> that that wasn't what was told to you?
>
> A.            Which one?

Judge to Giday's counsel:

---

[2] We note that the transcript of the hearing is filled with
examples of grammatical errors and awkward word choice
indicating the likelihood of a less than perfect translation from
Giday's native Tigrean to English. Translation is a complex and
tiring task; errors are bound to occur even in the best of circum-
stances with the most competent translators. Errors cannot be
avoided, but immigration judges must be sensitive to the complex-
ities of receiving testimony through a translator and take into
account these difficulties when assessing credibility.

Q.          I'm not planning to ask any further ques-
            tions on this issue, counsel. The respon-
            dent has failed to explain the inconsistent
            testimony.

(R. at 95-96).

We have previously given impatient and inappropriate judges a pass on the theory that "[a]n immigration judge is permitted to interrogate, examine, and cross-examine the alien and any witnesses." *See Diallo v. Ashcroft*, 381 F.3d 687, 701 (7th Cir. 2004), citing 8 U.S.C. § 1229a(b)(1). An immigration judge, unlike an Article III judge, is not merely the fact-finder and adjudicator but also has an obligation to establish the record. *Hasanaj v. Ashcroft*, 385 F.3d 780, 783 (7th Cir. 2004). But when the questioning becomes so aggressive that it frazzles applicants and nit-picks inconsistencies, any benefit that the barrage of questions contributes to the development of the record may be lost in the distortion it creates. And by the end of the hearing, Giday became so distraught that the immigration judge was forced to pause the proceedings to give "the respondent a chance to collect herself, since the respondent is emotional." (R. at 114). This case presents a close call and one we need not make, for in any case this matter must be remanded to rectify issues with the immigration judge's credibility determinations. We note, however, that the volume of case law addressing the issue of the intemperate, impatient, and abrasive immigration judges should sound a warning bell to the Department of Homeland Security that something is amiss. *Diallo*, 381 F.3d at 701, *Hasanaj*, 385 F.3d at 783, *Kerciku*, 314 F.3d at 918, *Podio*, 153 F.3d at 510. As we have said before, an immigration judge, like any judge, must display the "patience and decorum befitting a person privileged with this position." *Diallo*, 381 F.3d at 701.

## A. Credibility Determination

Although we may overlook the immigration judge's intemperate questioning, we cannot affirm his adverse credibility finding. An immigration judge's credibility determinations are accorded substantial deference and should only be overturned under extraordinary circumstances. *Korniejew*, 371 F.3d at 382. Although this standard of review of an immigration judge's credibility determination is highly deferential, "we will not automatically yield to the immigration judge's conclusions when they are drawn from insufficient or incomplete evidence." *Rodriguez Galicia*, 422 F.3d at 537 (citing *Georgis v. Ashcroft*, 328 F.3d 962, 968 (7th Cir. 2003)); *Tabaku v. Gonzales*, 425 F.3d 417, 421 (7th Cir. 2005) (same). We cannot uphold credibility assessments unmoored from the record, based on nothing but the immigration judge's personal speculation or conjecture. *Tabaku*, 425 F.3d at 421. Instead, credibility findings must be based on specific cogent reasons that bear a legitimate nexus to the finding and that go to the heart of the applicant's claim. *Rodriguez Galicia*, 422 F.3d at 537; *Tabaku*, 425 F.3d at 421 (internal citations omitted).[3]

The immigration judge gave four reasons for his adverse credibility determination. First and foremost, he expressed concern about inconsistencies in Giday's testimony regarding her second call to serve in the national service of Eritrea in May 1998. According to the immigration judge, Giday testified first that she was "given a pass not to serve" because she was getting married and attending school. The immigration judge claims that she then changed her story

---

[3] Section 101(a)(3) of Title I of the REAL ID Act of 2005, 8 U.S.C. § 1158(b)(1)(B), contains new standards for credibility determinations in cases involving applications for asylum. These standards apply only to applications made on or after May 11, 2005 (the date of enactment). *See id.* Since Giday applied for asylum more than three years prior to the effective date of the Act, the new standard does not apply.

to mislead the court into thinking that she had to hide from the government in order to avoid service.

Even with our thumbs on the deference side of the scale, we cannot submit to an immigration judge's determination of inconsistent testimony when the record does not support the finding. According to Giday, after she had already satisfied her obligation for mandatory national service in 1995, she was again summoned for national service in May 1998. The record does not reveal whether representatives of the national service came to her home or summoned her by telephone or mail, but when asked to serve again, Giday responded that she could not serve because she was soon to be married and also because she was attending school (R. at 85). The representative of the national service responded, "well, when we need you, you should be able to go with us." (R. at 89). From that point forward Giday avoided national service by hiding from the call—moving back and forth between her mother's house and her fiance's house. (R. at 86) ("I have been in a sort of hiding. They could not trace me where I am. Sometimes I go to my fiance's house, sometimes I stay where I am."); (R. at 88) ("Your Honor, I was using my time that sometimes I go to my fiance's house, sometimes I go to my mother's house in order to pass that time when they needed, when they called people just to kill that time. That's what I have been using not to be caught by them."); (R. at 89) ("that's what I have been doing not to be traced where I am, so I had two places where they can't catch me."); (R. at 91) ("whenever I get information that when they are ready to pick people or to take people to national service, I go to my boyfriend's house to hide.").

The immigration judge seemed quite concerned that representatives from the national service never came and took her to serve forcibly. Giday's testimony, however, explains that on her first encounter with the government officers she was informed that she would be conscripted and

that when she was needed she would have to serve. She successfully avoided this future obligation by continuing to hide. The immigration judge found Giday incredible because she "attempted to have this Court believe that she was in hiding for her refusal to serve in the army when in fact she was allowed an excuse not to serve in the army after May of 1998." (R. at 47). We can find nowhere in the record where Giday testified that she was granted a pass based on her marriage and school excuse. In fact, she notes that in response to her marriage and school excuse, she was told simply, "when we need you, you should be able to go with us." (R. at 89). It is true that the government agents did not forcibly conscript her the day that they came calling, (R. at 87) ("I told them what my situation is, and they didn't force me."), but neither was she "allowed an excuse not to serve in the army" as the immigration judge alleged. (R. at 47). In response to the immigration judge's multiple questions about how she avoided the consequences of dodging the call, she continually and consistently stated that she avoided service by hiding. (R. at 86), (R. at 88),(R. at 89), (R. at 90) & (R. at 91).

This, of course, was not the immigration judge's only credibility concern. He also pointed out that when Giday was questioned by counsel as to why she was arrested, she stated, "They came and took me, because they say that my mother's Ethiopian, and I didn't serve under the national service, and they didn't want me to be in Eritrea." (R. at 93). Subsequently, Giday testified that she was arrested because her mother was Ethiopian. (R. at 98). Although the subject matter is material, the discrepancy is minor and easily explained. Adverse credibility determinations should not be based upon easily explained discrepancies or perceived discrepancies. *Korniejew v. Ashcroft*, 371 F.3d 377, 387 (7th Cir. 2004). Nor should they be based on matters that do not go to the heart of the asylum claim. *Id.* at 383; *Uwase v. Ashcroft*, 349 F.3d 1039, 1043 (7th Cir.

2003). The confusion is easily explained by Giday's later testimony. When the police initially arrested Giday, she did not know why they had seized her: "They didn't explain to me why they took me, but, after they took me to their, to the station where the Ethiopians were arrested, and I told them that I'm not an Ethiopian, and my father's Eritrean, and, also, I did serve my national service, why are you taking me?" (R. at 97). And because she spent so much time evading the second draft, her first conclusion may well have been that she was being arrested for dodging the call to service. When she arrived at the detention center, however, she observed that it was filled with persons of Ethiopian ancestry whom the government planned to deport to Ethiopia. (R. at 98). It is error for an immigration judge to find an asylum applicant not believable based on such a minor and easily explained discrepancy.

The third alleged inconsistency involves the amount of time that Giday spent in detention. On her application for asylum and withholding of removal Giday states that "[i]n September 2000, while my husband was away at school, the police came and arrested me. I was held for three weeks while being abused and beaten by authorities." During her testimony in front of the immigration judge, Giday repeatedly talked about the two weeks she spent in the detention center. (R. at 99) ("on [sic] my case I was told that in two weeks I should be able to leave."); (R. at 100) (Q. by Judge: So, total, you were in detention camp for two weeks?" A. "Yes."). When the immigration judge confronted her with the inconsistency between her written and oral testimony her only explanation was that "[t]he right one is three weeks. I was not getting the [sic] right. It wasn't two weeks." (R. at 106). We agree that her answer is a bit unsatisfying. After all, she had mentioned the time frame of two weeks at several points in her testimony. Again, however, the discrepancy is easily explained. Giday's oral testimony was actually that she was held for two weeks and two days:

- •"After my being there for two weeks, after two weeks, they told us that you guys will be leaving in two days." (R. at 100);

- •"[A]fter my two weeks detention, and after I learned that they are going to take me in two days, then after they told us, I was lucky enough that I was helped by God and my husband." *Id.;*

- •"[A]fter that, I was arrested for two weeks, and after that they told that we'll be deported in two days." (R. at 104).

Because Giday was detained for more than two and less than three weeks, it is not odd that she might report the duration as either two weeks or three weeks. Thus this discrepancy, like the previous one, is easily explained. *Korniejew*, 371 F.3d at 387. And in any case, it simply is not material. We think it unlikely that the BIA would have granted a request for asylum based on a twenty-one day detention but denied it for a sixteen or seventeen day detention with identical facts. This irrelevant inconsistency, therefore, cannot form the basis of an adverse credibility determination. *Rodriguez Galicia*, 422 F.3d at 537.

Furthermore, Giday does not base her claim of past persecution on her detention, but on her forced deportation from Eritrea based on her Ethiopian ancestry. Her detention, whether two weeks or three weeks, is additional evidence of Eritrean animus toward and hostile treatment of Ethiopians, but it is her forced deportation that forms the crux of her claim of past persecution.

The immigration judge's final credibility concern centered around Giday's treatment in the detention camp. Giday's asylum application narrative states that "I was held for three weeks while being abused and beaten by police authorities." (R. at 210). She also states, the police officers abused us verbally and physically, while we were held in a very dirty cell." *Id.* At her hearing, the immigration judge

asked her to explain what happened during her two weeks in the camp, and she answered,

> Well, in that two weeks, the place was, it wasn't very good, there was no air conditioning, it was very hot, and, also the police who were the guards who are using very bad language. They were accusing us, and they didn't give me a chance to explain that I'm Eritrean. And, also, the facility was not good. We would not have a chance to go out, and we, the place was really dirty.

(R. at 104). The judge later confronted her with her written statement about being beaten and says, "[o]ne second. I will give you a chance on the next tape to explain." (R. at 106). The transcript resumes without any further mention of the inconsistent statement regarding the beatings. (*See* footnote 1, *supra*). The immigration judge's oral decision and order states, "[t]he respondent was given the opportunity to explain once again the inconsistency, and the respondent's explanation was that she was pushed around in the detention camp." (R. at 49). Due to the incomplete transcript we cannot review this alleged inconsistency. Nor can we determine whether the term "pushed around" is the immigration judge's summary of Giday's testimony or her own words. In any case, an inconsistency between being "beaten" and being "pushed around" is simply a matter of degree and could easily arise due to translation error.[4]

---

[4] As we noted earlier, the transcript in this case abounds with grammatical errors and awkward word choice. Immigration judges must consider the possibility of translation errors or misunderstandings when the credibility determination hinges on inconsistencies that could be explained by word choice expressing matters of degree (e.g., in this case "beaten" or "pushed around"). *See Iao*, 400 F.3d at 534 (noting a frequent insensitivity to the possibility of misunderstandings caused by the use of translators in immigration cases).

Nevertheless, we cannot disturb a credibility determination simply because an alternate finding could also be supported by substantial evidence. *Capric v. Ashcroft*, 355 F.3d 1075, 1086-87 (7th Cir. 2004). But even were we convinced that the inconsistency between being "beaten" and "pushed around" was material and consequential, it seems unlikely that the immigration judge would make the same credibility determination based on one inconsistency rather than the four he originally noted. *See Georgis v. Ashcroft*, 328 F.3d 962, 970 (7th Cir. 2003) ("having found that the other five reasons given by the IJ for discrediting [the applicant] are either unsupported by the evidence in the record or based on incomplete or improperly excluded evidence, we are not inclined to defer to his credibility determination on this remaining sixth ground alone.") In short, the credibility determination in this case is not supported by cogent reasons bearing a legitimate nexus to the finding, and the matter must be remanded for a new hearing.

## B.  Persecution

Although the immigration judge disbelieved the bulk of Giday's testimony, he went on to consider whether she was entitled to asylum assuming the truth of her claims. He concluded that she was not. To establish such a claim, Giday had the burden of proving that she was a refugee—a person who has endured past persecution or has a well-founded fear of future persecution based on one of the statutorily protected categories, including, nationality. *See* 8 U.S.C. § 1101(a)(42)(A); *Diallo*, 381 F.3d at 697. The statute presumes that an applicant who has endured past persecution has a well-founded fear of future persecution—a presumption that the Department of Homeland Security may rebut by demonstrating a change in circumstances or a reasonable ability on the applicant's part to

relocate within the applicant's country. 8 C.F.R. § 208.13(b)(1); *Diallo*, 381 F.3d at 697. The applicant who fails to demonstrate that she has faced past persecution, can still establish a genuine fear of future persecution based on credible, direct, and specific evidence that a reasonable person in the same circumstances would fear persecution if returned. *Hernandez-Baena v. Gonzales*, 417 F.3d 720, 723 (7th Cir. 2005).

The immigration judge found that Giday failed to establish that she faced past persecution or that she had a well-founded fear of persecution should she return to Eritrea.[5] We must affirm the decision of the immigration judge if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992), and reverse only where the evidence is so compelling that a reasonable fact-finder would be compelled to reach an opposite conclusion.

---

[5] As noted above, where the BIA affirms and adopts the decision of the immigration judge, we review the immigration judge's order. In this case it is unclear whether the BIA affirmed and adopted the immigration judge's decision on past persecution or made an alternate finding. The BIA's order states, "Although respondent may have demonstrated that she experienced past persecution . . . we find that the presumption of future persecution is rebutted and that the respondent does not have a well-founded fear of persecution in her native land at this time." (R. at 2-3). The government argues that the BIA's statement is a mere "alternative holding" and does not reflect any disagreement with the immigration judge's finding of no past persecution. The language of the BIA order certainly suggests disagreement with the immigration judge's finding of no past persecution. Furthermore, had the BIA meant merely to adopt and affirm the immigration judge it would have had no reason to write further on the subject. We need not resolve this minor issue, however, as the decision on past persecution must be revisited by the immigration judge on remand for the reasons we describe at length below.

*Diallo*, 381 F.3d at 695. This expansive level of deference, however, does not require or permit us to affirm unreasoned decisions. *Ioa*, 400 F.3d at 535.

We recently considered a claim of past persecution in the mirror image of this case involving two ethnic Eritreans who had been stripped of citizenship by Ethiopia. In that case the immigration judge below concluded that the petitioners had not been subject to past persecution when the Ethiopian government stripped them of their citizenship, reasoning that a sovereign country has a right to determine who is or is not a citizen. *Haile v. Gonzales*, 421 F.3d 493, 494 (7th Cir. 2005) (citing *Faddoul v. INS*, 37 F.3d 185, 189 (5th Cir. 1994) and *De Souza v. INS*, 999 F.2d 1156, 1159 (7th Cir. 1993)). On appeal, this court challenged the reasoning of the immigration judge, noting the distinction between denying citizenship to a non-citizen resident and stripping a person of citizenship already attained. *Id.* at 496. We further suggested that a program of denationalization and deportation would indeed seem to constitute persecution, but left that final determination to the BIA whose job it is to determine the meaning of the term persecution. *Id.* The immigration judge's decision below simply ignores Giday's claim of past persecution in the form of forced denationalization and examines, instead only her detention and her claims of feared future persecution.

In examining Giday's fear of future persecution, the immigration judge first focused on the arrest and deportation of Giday's mother. "Attacks on family members," he concluded, "do not necessarily establish a well-founded fear of persecution absent a pattern of persecution tied to the petitioner." (R. at 52). Although this is an accurate statement of the law, it simply does not apply in Giday's case. Giday is not making a claim of derivative persecution, but of direct past persecution. According to her story, Giday herself was detained and threatened with deportation. And

but for her husband's bold attempts to bribe the detention camp guards, Giday would have been stripped of her Eritrean citizenship and deported to Ethiopia. Her mother's adversity merely serves as evidence of the fact that Eritrea was indeed deporting persons of Ethiopian nationality. In discussing whether Giday's story of detention and threatened deportation constitutes past persecution, the immigration judge made the odd observation that "the respondent was able to leave detention after her husband bribed officials." It would be illogical indeed to deny asylum to the refugee who narrowly escaped persecution, particularly where escape came only by bribing corrupt, rogue government officers. It is an error of law to assume that an applicant cannot be entitled to asylum if she has demonstrated the ability to escape persecution only by chance or by trying to remain undetected. *See, e.g.*, *Muhur v. Ashcroft*, 355 F.3d 958, 960 (7th Cir. 2004) (it is a clear error of law, that one is not entitled to claim asylum on the basis of religious persecution if one can escape the notice of the persecutors by concealing one's religion). There is no guarantee that, should Giday return to Eritrea and be threatened with deportation again, she will again be so lucky to be detained by police officers amenable to pay-offs. *See, e.g.*, *Garcia-Ramos v. INS*, 775 F.2d 1370, 1374 (9th Cir. 1985) (when an applicant "obtained his passport by paying a bribe to a government official: his ability to obtain a passport may have little or no relevance to his claim of possible persecution.")

Equally strange is the immigration judge's notion that Giday's mandated service in the Eritrean army was evidence not only of the fact that Giday was considered a citizen of Eritrea, but also that the government of Eritrea somehow conferred benefits of citizenship upon her. The immigration judge wrote, "[t]he respondent was considered Eritrean enough that she was serving in the Eritrean Army in 1995. The evidence reflects that this respondent has been

allowed to have all of the benefits as a national of Eritrea." (R. at 53). Giday would be shocked, we think, to learn that her compelled national service was somehow a benefit of citizenship. And in any case, the service to which the immigration judge referred occurred in 1995— before the major conflict erupted between Ethiopia and Eritrea. (R. at 138). As for the government's attempts to compel her to perform a second round of service in 1999, we do not understand how compelled national service offers any indicia of citizenship. In this country, for example, all male persons between the ages of eighteen and twenty-six residing in the United States, whether citizens or not, must register with the selective service (although an exception is made for aliens admitted as non-immigrants). 50 U.S.C.A. app.§ 453. Resident aliens were drafted alongside United States citizens during the Vietnam War. *See Dunn v. INS*, 419 U.S. 919, 921-22 (1974) (Stewart, J., dissenting from denial of certiorari.) At times, various government regimes have used the draft to persecute hated ethnic minorities by sending them into battle unprepared or in the most hazardous of positions. *Miljkovic v. Ashcroft*, 376 F.3d 754, 756 (7th Cir. 2004). The immigration judge's statement that "it is well-settled that forced recruitment into the military and prosecution for refusal to serve in the military are not considered persecution" paints the legal landscape with too broad a stroke. (R. at 54). Giday did not appear to argue that she was singled out for service based on her Ethiopian nationality, although her testimony that her brothers disappeared after being drafted certainly raises the question of whether national service was particularly dangerous or deadly for those of Ethiopian descent. In any case, Giday's claim of forced conscription is again backdrop for her primary claim of past persecution—forced denationalization and deportation, a claim largely ignored by the immigration judge below.

This case, like our recent decision in *Haile*, demands a remand not only to correct errors in the credibility determi-

nations described above, but also for additional consideration of whether Giday's threatened deportation constitutes past persecution.

As for Giday's well-founded fear of future persecution, the BIA found that the government had successfully rebutted any claim of a well-founded fear of future persecution by demonstrating that the conditions in Eritrea had improved substantially for people of Ethiopian extraction. (R. at 2). Although the conditions for Ethiopians certainly have improved since Giday escaped in 2000, according to the State Department's 2004 Country Report on human rights in Eritrea (hereinafter "2004 Report"), Eritrea's human rights record remains poor.[6] Ethiopian nationals clearly face continued human rights abuses in Eritrea. The government singles them out for arrest when they are unable to renew their residency permits every six months and they continue to be detained in unknown numbers. 2004 Report at § 1(d). They are still prohibited from living in certain provinces of the Country. *Id.* at § 2(d) The Government continues to repatriate Ethiopians to Ethiopia although the State Department Report claims these repatriations—549 in 2003—are "voluntary." *Id.* Even if Giday is still considered an Eritrean National, it is uncertain whether she will be allowed to return, as citizens who have been declared ineligible for political asylum by another government may not be permitted to return to Eritrea. *Id.* Furthermore, it is unclear whether citizens who left without exit visas (as Giday did) would be permitted to return without consequences. *Id.*

---

[6] We take judicial notice of the country conditions as they exist currently. *Medhin v. Ashcroft*, 350 F.3d 685, 690 (7th Cir. 2003) (taking judicial notice of current state department country report); *Dobrota v. INS*, 195 F.3d 970, 973 (7th Cir. 1999) (taking judicial notice of the State Department's most recent country report on Romania).

In particular to Giday, the government continues to authorize the use of deadly force and torture against draft evaders and deserters—including prolonged sun exposure in temperatures up to 133 degrees Fahrenheit or the binding of hands, elbows, and feet for extended periods of time, and detention in conditions so dismal as to create mental and physical stress. *Id.* at § 1(a),(c). Although it might be true that sovereign governments do not engage in persecution when they draft citizens in order to raise armies or when they punish citizens for avoiding conscription (*See Tesfu v. Ashcroft*, 322 F.3d 477, 482 (7th Cir. 2003)), they are not given a free pass to torture and kill citizens as a form of such punishment. Although the Country Report states that efforts to detain women draft evaders have generally decreased in 2003, there is no evidence that they have ceased.

## III.

On remand, the immigration judge will need to consider the most recent version of the Country Report to determine whether, in fact, Giday's fear of future persecution should be allayed. Then too, will the immigration judge be able to re-assess the probability of persecution as required for a determination on Giday's request for withholding of removal and Convention Against Torture relief.

This matter is REVERSED and REMANDED for proceedings consistent with this opinion.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*