**UNPUBLISHED ORDER**
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued May 9, 2006
Decided July 24, 2006

**Before**

Hon. RICHARD D. CUDAHY, *Circuit Judge*

Hon. MICHAEL S. KANNE, *Circuit Judge*

Hon. DIANE P. WOOD, *Circuit Judge*

No. 05-3100

| | |
|---|---|
| KRISTANTY SANUSI, et al. | Petition for Review of an Order of the |
| *Petitioners*, | Board of Immigration Appeals |
| | |
| *v.* | Nos. A96-496-600, A96-496-601 & |
| | A96-496-602 |
| ALBERTO GONZALES, | |
| *Respondent*. | |

## O R D E R

The petitioners, a husband and wife and their minor son, applied for asylum and withholding of removal on grounds of ethnic and religious persecution in their native Indonesia. The petitioners did not timely seek asylum, and the IJ and the BIA agreed that they were ineligible for withholding because they had not demonstrated a clear probability of persecution should they return to Indonesia. The petitioners challenge the denial of withholding of removal, but that decision is supported by substantial evidence.

Kristanty Sanusi, the primary applicant, and her husband, Djoni Susanto Lie, are ethnically Chinese and practicing Catholics. They and son Steven, who is now seven years old, entered the United States most recently in May 2000 at Los Angeles, California, and overstayed their six-month visitor visas. The couple also

have a daughter, whose birth shortly after their arrival in the United States is not relevant to this case. In March 2003, almost three years after they arrived, the petitioners applied—as relevant here—for withholding of removal, claiming past persecution on account of their ethnicity and religion. Two months later DHS initiated removal proceedings and served the petitioners with Notices to Appear.

Sanusi and Lie were the only witnesses before the IJ. Sanusi, who is presently 33 years old, was educated in Catholic primary and secondary schools in her Jakarta neighborhood and graduated from college with a degree in accounting. Afterward she helped her father run his successful stationery store. Her parents, two brothers, and one of her sisters still live in Jakarta.

Sanusi's contention that she suffered ethnically or religiously motivated abuse really comes down to events during a few days in 1998 and 2000. In May 1998, according to Sanusi, students who were protesting economic conditions and the waning rule of then-president Haji Mohammad Suharto rioted in Jakarta and looted Chinese businesses. The government, she said, offered no protection, and during the riots her family home was burned and several of her neighbors were beaten. One year later, Sanusi continued, she left for an extended visit to the United States with Lie, but the couple returned voluntarily to Jakarta in August 1999 when her parents assured them that the situation in Indonesia had improved. During 2000, though, she twice encountered rock-throwing mobs. The first time, in January, she was attending Mass with other Chinese Catholics when people outside yelling "Allah Akbar" (a common Arabic expression meaning Allah is the Greatest) began pelting the church with stones. She did not make any effort to call the police and was unaware if any of the other parishioners had either. Then in mid-May, during the anniversary of the 1998 riots, protestors shouting "kill the Chinese" tried unsuccessfully to enter the temporary housing where her family had moved after losing their house. Nobody was injured in either attack, and neither the church nor the shelter was damaged.

Apart from these events, Sanusi focused on sexual abuse she suffered as a child. She testified that when she was seven or eight she was touched inappropriately by one of two men who accosted her and her aunt on a bus and demanded money at knife point. That time, she said, the assailants referred to her aunt as "Chinese." She also testified that a few years later, when she was 11, an individual (whom she did not describe) called her "Chinese" and tried to kiss her and touched her breast. Sanusi's testimony about this incident might be read to suggest that her assailant and his companions touched her more than once ("[q]uite often, when I passed by, they would look at me and then they would touch my breast"), but her counsel characterizes it as a single episode. The most serious attack, though, occurred when Sanusi was in junior high; she was sexually assaulted in front of her mother while the two were walking near the family home.

As before she did not describe the assailant, and this time neither did she attempt to ascribe any ethnic or religious motive to the attack.

Lie's testimony was shorter. He corroborated Sanusi's testimony about the attacks on the church and her family's temporary housing, but otherwise he had little to add about his own personal experiences. Mostly he implied that Indonesian authorities are indifferent to attacks on ethnic-Chinese. He testified that police did nothing when his uncle was murdered after he and Sanusi came to the United States; that testimony was false: a newspaper article introduced by the petitioners recounts that police had charged employees of the uncle with committing the murder during a robbery. Lie also testified that his brother had been robbed and beaten by people calling him "Chinese Bastard," and that his brother told him he saw an Indonesian marine fire a gun into a car occupied by an ethnic-Chinese family.

The IJ held that the petitioners were ineligible for withholding of removal because they had not demonstrated a clear probability of future persecution. Looking first to past events, the IJ found "scant evidence" that the petitioners, even assuming their testimony was credible, had suffered persecution while living in Indonesia. The IJ, while characterizing the destruction of Sanusi's parents' home as "an event of some significance," reasoned that the petitioners could not attribute the 1998 rioting to the government even though there was some indication that the government didn't take "effective action" to control the turmoil. Moreover, the IJ concluded that the two stone-throwing incidents in 2000 were "not really significant events" and, again, not attributable to the government.

As to whether the petitioners might reasonably fear future persecution apart from their past experiences, the IJ observed that their return to Indonesia in 1999 undermined any argument that events before that year were cause for them to fear the prospect of future abuse. The IJ then concluded that "[t]he history in Indonesia does not indicate that there is generalized mistreatment of Chinese or Catholics by the government or by a part of Indonesian society that the government will not control or is unwilling to control." The IJ recognized that reports on country conditions in Indonesia do evidence discrimination against ethnic Chinese—sometimes by the government—and opined that the government had "not done enough to protect its ethnic and religious minorities." The IJ also acknowledged recent, isolated attacks by extremists targeting ethnic Chinese and Christians in areas of Indonesia remote from Jakarta. But the IJ found "no indication that the government follows a persecutory policy toward Chinese or Catholic[s]," and concluded that the petitioners had not demonstrated widespread persecution of either ethnic Chinese or Catholics in Indonesia.

   The petitioners argue that substantial evidence does not support the IJ's and BIA's conclusion that they failed to establish past persecution. The BIA adopted the IJ's decision, so we review the IJ's order. *See Ali v. Ashcroft*, 395 F.3d 722, 727 (7th Cir. 2005). To have qualified for withholding of removal, the petitioners were required to show that it is more likely than not that their "life or freedom would be threatened" upon return to Indonesia on account of their "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); *Lhanzom*, 430 F.3d at 842. This standard is stricter than the standard for establishing asylum eligibility, *Prela v. Ashcroft*, 394 F.3d 515, 519 (7th Cir. 2005), and the IJ found that the petitioners would not have qualified for asylum even if their application had been timely. We review a denial of an application for withholding of removal for substantial evidence, and will grant a petition for review only if the petitioners' evidence compels relief. *Mabasa v. Gonzales*, 440 F.3d 902, 907 (7th Cir. 2006).

   The petitioners' evidence does not compel us to conclude that they were eligible for withholding of removal. Sanusi claimed she had been sexually assaulted on three occasions in her youth, although she alleged only stray remarks to show that the attacks were motivated by her ethnicity. She also testified that her parents' home was burned by student rioters in 1998, and that she and her husband were victims of two separate rock attacks in 2000. The IJ did not focus on whether the attacks against the petitioners were on account of their ethnicity or religion. Instead the IJ concluded that there was no link to the government. The IJ thought that the evidence suggested "a problem of Islamic extremism" in Indonesia, but he also concluded from the record that the government was attempting to correct the problem. Persecution is something perpetrated by the government or by a non-governmental group that the government refuses to control, *Margos v. Gonzales*, 443 F.3d 593, 599 (7th Cir. 2006); *Hor v. Gonzales*, 421 F.3d 497, 501-02 (7th Cir. 2005); *Mitreva v. Gonzales*, 417 F.3d 761, 764-66 (7th Cir. 2005), and the petitioners have not provided compelling evidence that the government of Indonesia was complicit or indifferent to their suffering.

   Moreover, the IJ considered the State Department's country reports and recognized the complex history of discrimination against ethnic Chinese and Catholics in Indonesia, but found no evidence of widespread persecution against either. We recently considered the conditions Chinese-Catholic Indonesians face, and rejected a petitioner's challenge to a denial of withholding of removal, concluding that the Indonesian government has taken steps to "control the ethnic and religious tension." *Firmansjah v. Gonzales*, 424 F.3d 598, 607 (7th Cir. 2005). And except for the Ninth Circuit, other circuits generally agree that the Indonesian government has worked to protect members of this group. *See Susanto v. Gonzales*, 439 F.3d 57, 61 (1st Cir. 2006); *Wijono v. Gonzales*, 439 F.3d 868, 874 (8th Cir.

2006); *Setiadi v. Gonzales*, 437 F.3d 710, 714 (8th Cir. 2006); *Lie v. Ashcroft*, 396 F.3d 530, 537 (3d Cir. 2005). *But see Lolong v. Gonzales*, 400 F.3d 1215, 1220-22 (9th Cir. 2005); *Sael v. Ashcroft*, 386 F.3d 922, 925-27 (9th Cir. 2004). That Sanusi's family has remained in Indonesia and continues to attend the same church in Jakarta further belies the petitioners' claim that they fear future persecution. *Firmansjah*, 424 F.3d at 607.

Accordingly, there is substantial evidence to support the IJ's withholding decision. In a final attempt to undermine that conclusion, the petitioners contend that the IJ denied them of a full and fair hearing by disregarding "relevant" testimony because it was too remote in time. We review *de novo* the purely legal question of whether an immigration hearing violated due process. *Giday v. Gonzales*, 434 F.3d 543, 547 (7th Cir. 2006). The Fifth Amendment Due Process Clause requires that aliens be afforded a meaningful opportunity to be heard and a reasonable opportunity to present evidence during deportation proceedings. *See id.* This standard ensures petitioners a full and fair opportunity to present their case without frequent interruptions or hostility from the IJ. *Id.* at 548. Here, though, the petitioners contend only that the IJ improperly disregarded certain events. They do not suggest that the IJ overreached his role as arbitrator to control testimony or that he improperly barred complete chunks of oral testimony that would have supported their claims. Instead the IJ allowed the record to develop during the proceedings, and only afterwards did he decide to assign no weight to events he considered too remote to bear on the issue of persecution. The IJ's weighing of evidence after the petitioners were afforded a meaningful opportunity to be heard, did not violate their right to due process. *See Liu v. Ashcroft*, 380 F.3d 307, 315 (7th Cir. 2004); *Kerciku v. INS*, 314 F.3d 913, 917-18 (7th Cir. 2003). The petition is DENIED.