Bernabe CHITAY–PIRIR, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 98–3072.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 24, 1999.

Decided March 10, 1999.

Susan A. Swingle (argued), Winston & Strawn, Chicago, IL, for Petitioner.

Samuel Der-Yeghiayan, I.N.S., Chicago, IL, for Respondent.

Before EASTERBROOK, MANION, and EVANS, Circuit Judges.

EASTERBROOK, Circuit Judge.

Bernabe Chitay–Pirir, a citizen of Guatemala, entered the United States in 1996 "without inspection"—meaning that he stole across the Mexican border. He was caught and has been in the custody of the Immigration and Naturalization Service ever since, awaiting deportation. To avoid being returned to Guatemala, Chitay–Pirir filed an application for asylum. He made a plausible case. Between 1960 and the end of 1996 a civil war raged in Guatemala. Guerrillas under the banner of the Unidad Revolucionario Nacional Guatemalteco (URNG) opposed a succession of autocratic regimes. Terrorism was practiced on both sides. Amerindians in the highland provinces of Guatemala (a group that includes Chitay–Pirir), many of whom speak languages descended from Mayan rather than Spanish, tended to side with the guerrillas; assisted by paramilitary death squads, the government attempted to suppress the insurrection and did very little to promote the rule of law. Chitay–Pirir told the immigration judge that death squads had murdered his father and uncle (both of whom took the URNG side) and one of his cousins (another URNG sympathizer). At the age of 13 Chitay–Pirir himself joined the guerrillas. Although he deserted after three months, the local "civil defense patrol" (the polite name for a death squad) knew what he had done. To terrorize his family it forced Chitay–Pirir's brother to watch the execution of his cousin. Fearing for his own life, Chitay–Pirir went into hiding in Guatemala City, and the "civil defense patrol" transmitted through his family the threat of death should he reveal who had killed his cousin. The immigration judge credited this story but found that it did not establish either a history of political persecution (no one harmed Chitay–Pirir himself) or a prospect of future persecution. The Board of Immigration Appeals affirmed.

When he entered the United States, Chitay–Pirir was only 15 years old. He was 16 by the time of the hearing and is now 18. Chitay–Pirir asked the BIA to appoint (or secure the appointment of) a guardian ad litem to take charge of his interests. The Board declined, observing that "respondent was not in the middle of a custody dispute; he was represented by counsel and living with an adult relative". He was indeed represented by counsel, but the Board's belief that he was "living with an adult relative" is a figment of its imagination; he had been in the custody of the INS (not exactly his "adult relative") since 1996. Still, he did have an attorney and had ample opportunity to obtain other help. He was housed in a contract detention facility operated by Travelers and Immigrants Aid, which works with the Midwest Immigrant Rights Center to present claims to the INS, and these organizations have afforded substantial *pro bono* assistance to Chitay–Pirir.

An amicus curiae that has filed a brief to advocate the routine appointment of guardians for minor aliens tells us that a guardian might have found a social worker who might have been able to develop a friendship with Chitay–Pirir, who then might have provided additional helpful details, but this is all speculation—too many "might have beens" to offset the difficulties that having *two* adult representatives (both guardian and lawyer) could have caused, if they disagreed with each other about how to proceed. We grant that youngsters are unlikely to understand the details of the asylum process (or how immigration officials will react to their narratives), and that some youthful applicants for asylum may be so traumatized by what happened in their native lands that they

will be unable to assist their lawyers without professional help from outside the bar. But when that is so, the lawyer should see to it that help is obtained—and Chitay–Pirir has indeed had the benefit of a psychological evaluation. Other applicants, less well supplied with professional assistance than was Chitay–Pirir, have more to gain from a guardian or some other source of adult help. But Chitay–Pirir cannot complain about this aspect of the way the INS handled his claim, see *Calero v. INS*, 957 F.2d 50 (2d Cir.1992), and it is therefore unnecessary for us to decide when, if at all, the Constitution requires the provision of adult assistance at public expense. Cf. *M.L.B. v. S.L.J.*, 519 U.S. 102, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996).

■ Chitay–Pirir will have need of this aid again, for the Board must review his case a second time. The Board's statement that Chitay–Pirir was "living with an adult relative" is not its only gaffe. Chitay–Pirir contended that the central government of Guatemala is unable (or unwilling) to control the death squads, so that he has been and will be exposed to persecution on account of his anti-government views, and that he faces an additional hazard because he knows the identities of his cousin's assassins. To demonstrate the magnitude of these risks he points to the fact that his father, his uncle, and his cousin were murdered for their support of the URNG. The Board replied that all four members of the local "civil defense patrol" have been arrested, and that two were convicted of the cousin's murder, demonstrating that the central government is willing and able to control the principal threat that Chitay–Pirir fears. Alas, the Board's assertion has no support in the record, which shows only that the hit men were detained and quickly released, and that two of the four were detained a second time. What happened to these two is unknown. The INS concedes in its brief that the Board's assertion about prosecutions and convictions is unfounded.

To fortify its conclusion that Chitay–Pirir faces no real risk of persecution in Guatemala, the BIA stated that he has never been threatened by members of the "civil defense patrol" and that no harm came to him during the two years he remained in Guatemala after his cousin's death. The first of these statements is true only in the most literal sense: threats were not made *to Chitay–Pirir*, because he had gone into hiding in Guatemala City; the threats were relayed to him through family members who continued to live in his village. That relatives transmitted the threats on behalf of the "civil defense patrol" does not imply that Chitay–Pirir is out of danger. As for the two years of safety: the correct period between the murder and Chitay–Pirir's departure from Guatemala is 16 months, most of which was spent underground in Guatemala City. Chitay–Pirir would not find it reassuring that by living a fugitive's life he can avoid execution. Nor would he be comforted by the fact that both the BIA and the INS assert that Chitay–Pirir had little to fear from *the rebels* just because he knows who killed his cousin. They appear to have confused the death squads with the URNG. It is impossible to be confident that Chitay–Pirir's claim has been fully understood or analyzed. See also *Hengan v. INS*, 79 F.3d 60 (7th Cir.1996); *Salameda v. INS*, 70 F.3d 447 (7th Cir.1995); *Osmani v. INS*, 14 F.3d 13 (7th Cir.1994).

None of this is to say that Chitay–Pirir is necessarily entitled to either asylum or withholding of deportation. An applicant for withholding of deportation must show a "clear probability" that his "life or freedom would be threatened" on account of a list of factors. 8 U.S.C. § 1253(h)(1); *INS v. Stevic*, 467 U.S. 407, 413, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). The record does not compel a conclusion that this standard has been satisfied. Asylum lies in the discretion of the Attorney General, 8 U.S.C. § 1158(a); *INS v. Cardoza–Fonseca*, 480 U.S. 421, 428 n. 5, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), who need not call all hostility toward those who fought in a civil war "persecution." Moreover, since Chitay–Pirir entered the United States, the civil war in Guatemala has come to an end. For all we know, the death squads have at last been rounded up, and people in Chitay–Pirir's position can return home without fear. Cf. *Gramatikov v. INS*, 128 F.3d 619 (7th Cir.1997). But maybe legitimate grounds for apprehension remain. The Board should supplement the record with evidence about the current state of af-

1082

fairs in Guatemala, so that a discerning judgment can be formed.

VACATED AND REMANDED.