In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 05-1711

GUO H. HUANG,

*Petitioner*,

*v.*

ALBERTO R. GONZALES,

*Respondent*.

———————

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A95-577-259

———————

ARGUED APRIL 19, 2006—DECIDED JULY 14, 2006

———————

Before COFFEY, EASTERBROOK, and MANION, *Circuit Judges.*

MANION, *Circuit Judge.* Guo Huang applied for asylum alleging that Chinese family planning cadres forced his wife to have an involuntary abortion. An immigration judge denied the application, finding that Huang was not credible and had not demonstrated either past persecution or a reasonable fear of future persecution. Because the IJ's adverse credibility finding was based on substantial evidence, including Huang's submission of a certificate purportedly documenting his wife's forcible abortion, we deny the petition for review.

**I.**

At his asylum hearing before an Immigration Judge, Guo Huang testified that he, his wife, and their son are from Lianjiang County in Fujian Province. After his son's birth, his wife had an IUD implanted according to mandatory birth control practices. But in 1999 the Huangs paid a private doctor to remove the IUD, and in March 2000 she learned that she was pregnant. The pregnancy was in its very early stages at that point, and the Huangs moved to a nearby town, purportedly to prevent family planning authorities from discovering her condition. She subsequently missed her mandatory physical examination, given every three months.

Huang alleged that his wife's failure to appear for the physical alerted the family planning authorities that she might be pregnant, and that on May 15, 2000, the "family planning cadres found her." Huang testified that when he came home and found his wife missing, someone told him that she had been seized by family planning cadres as she was taking out the trash. He asserted that he went to the local clinic to find her, but by the time he arrived she had already had an abortion. Huang specifically testified that the abortion was involuntary. He also offered a certificate, signed by a physician and bearing an official seal from the Lianjiang County Hospital, which states that Jin Fang Huang underwent an "artificial abortion" on May 15, 2000. The certificate does not specify whether the procedure was voluntary or involuntary. Huang testified that she was given the certificate after he asked the hospital for "proof in case later on my wife suffer any complication afterwards they can help." Finally, he testified that if he were returned to China he feared imprisonment because of his wife's pregnancy. Also, he was concerned about his "illegal exit,"

a reference to his once having a valid passport that he relinquished to the snakeheads who helped smuggle him to the United States.[1]

After Huang testified, the IJ read aloud portions of a background report prepared in March 2000 by the Canadian Embassy in Beijing describing conditions in Lianjiang County. The IJ noted that according to the report, forced abortion and forced sterilization were no longer accepted methods for enforcing birth control, even though local government officials acknowledged problems with this in the past. The IJ also referred to the State Department's 1998 Profile of Asylum Claims and Country Conditions, which states that the U.S. embassy was "unaware of any so-called 'abortion certificates,' which are often presented as part of asylum applications as evidence of a forced abortion." That report says that "the only document that might resemble such a certificate and result in confusion is a document issued by hospitals upon a patient's request after a voluntary abortion."

The IJ then issued his decision, ruling that Huang failed to establish his claim for asylum because he was not credible.

---

[1] Huang's wife did not come to America with him, and remains in China. Her absence in these proceedings is, in itself, no bar to Huang's claim. "[T]he spouse of a woman who has been forced to undergo an abortion or sterilization procedure can thereby establish past persecution." *In re C-Y-Z*, 21 I. & N. Dec. 915, 918 (B.I.A.1997); *see also Zhang v. Gonzales*, 434 F.3d 993, 1001 (7th Cir. 2006) (citing *In re C-Y-Z*); *Lin v. Ashcroft*, 385 F.3d 748, 753 (7th Cir. 2004). At oral argument, Huang asserted that his intention was to bring his family over from China after he had obtained asylum. *See* 8 U.S.C. § 1158(b)(3)(A) (allowing the spouse or child of an asylee "be granted the same status as the alien if accompanying, or following to join, such alien").

Specifically, the IJ stated that he "did not believe [Huang's] story and believes that [Huang's] wife either never went for an abortion, or perhaps agreed to have a voluntary abortion on May 15, 2000." The IJ based this finding on several perceived inconsistencies in Huang's story. First, the IJ noted that Huang failed to explain how the authorities located the family after their move to Guantou Town less than two months earlier, or why they would be searching for her so early in the pregnancy. The IJ also doubted Huang's testimony that his wife's missed physical examination accounted for her being seized by family planning cadres and forced to undergo an abortion. Moreover, the IJ noted that Huang testified that his family was not threatened with fines or pressured in any other way before the alleged abortion. The IJ also emphasized that forcible abortions were not being performed at the time in Fujian Province and that certificates are given not to women who have involuntary abortions, but rather to women who undergo voluntary abortions and want proof of the procedure to qualify for medical leave from work. Having found him incredible, the IJ ruled that Huang had not shown that he or his wife had suffered past persecution or that he had a well-founded fear of future persecution if returned to China. The Board of Immigration Appeals adopted and affirmed the IJ's ruling.

## II.

Credibility determinations must be supported by cogent and specific reasons and bear a legitimate nexus to the finding. *Gjerazi v. Gonzales*, 435 F.3d 800, 807 (7th Cir. 2006); *Mansour v. I.N.S.*, 230 F.3d 902, 906 (7th Cir. 2000). This court affords substantial deference to an IJ's stated reasons, and will overturn a credibility finding only in "extraordi-

nary circumstances." *Giday v. Gonzales*, 434 F.3d 543, 550 (7th Cir. 2006). No such deference is due, however, to credibility findings that are "drawn from insufficient or incomplete evidence." *Georgis v. Ashcroft*, 328 F.3d 962, 969 (7th Cir. 2003). The credibility analysis in this case is not affected by the REAL ID Act of 2005, Pub.L. No. 109-13, 119 Stat. 231, because Huang filed his asylum petition before the passage of that statute. *See Diallo v. Gonzales*, 439 F.3d 764, 766 n.1 (7th Cir. 2006).

Huang correctly argues that some of the IJ's bases for his credibility finding were not founded in cogent and specific reasoning. For instance, the IJ merely speculated, without support in the record, that family planning cadres could not or would not take action so quickly after discovering that Huang's wife was pregnant. Nor does the record support the IJ's conclusion that Huang's testimony was "simply too weak to establish a credible or plausible claim" because he failed to testify that he had been threatened with fines or lesser sanctions. The IJ had no basis in the record to find that the family planning authorities would resort to lesser sanctions in a case where the family had already fled. If the IJ had based his credibility determination on this reasoning alone, the credibility finding would be unsupportable; we "cannot uphold credibility assessments unmoored from the record, based on nothing but the IJ's personal speculation or conjecture." *Tabaku v. Gonzales*, 425 F.3d 417, 421 (7th Cir. 2005); *see also Lin v. Ashcroft*, 385 F.3d 748, 755-56 (7th Cir. 2004).

But the IJ did base his finding on one ground that is sufficient to support the determination. The IJ specifically alluded to the State Department asylum profile to suggest that the Chinese government does not issue certificates of involuntary abortions, and found that Huang's testimony

and his characterization of the abortion certificate were inconsistent with the report. The IJ relied on the State Department's 1998 Profile of Asylum Claims and Country Conditions Report, which disclaimed any knowledge of involuntary abortion certificates:

> The U.S. Embassy and Consulate General are unaware of any so-called 'abortion certificates,' which often are presented as part of asylum applications as evidence of a forced abortion. According to Embassy officials, the only document that might resemble such a certificate and result in confusion is a document issued by hospitals upon a patient's request after a voluntary abortion. This certificate is used by patients as evidence to request 2 weeks of sick leave after an abortion has been performed, a right provided by the law.

The IJ held that when viewed in light of the profile, Huang's "explanation as to the issuance of an abortion certificate in May of 2000 suggests that his wife agreed to have the abortion, it was not forced."

We have not yet directly addressed whether an official certificate offered as proof of a forced abortion constitutes evidence of such persecution despite a contrary State Department profile, but we have twice relied on the profile to hold that IJs may not demand such certificates as corroboration of claims of a forcible abortion. *See Zhang v. Gonzales*, 434 F.3d 993, 999-1000 (7th Cir. 2006); *Lin v. Ashcroft*, 385 F.3d at 753-54. In both cases, we cited the same passage from the State Department profile relied upon in this case and held that the petitioners' failure to present documentary evidence of an involuntary abortion was excusable because any such documentation "would imply that the procedure was voluntary as opposed to forced." *Lin v. Ashcroft*, 385 F.3d at 753. "According to Embassy officials, the only

document of that nature is one provided only in cases of voluntary abortions, in which certificates are provided to allow the patient to obtain time off work. The absence of a hospital certificate . . . is entirely consistent with [allegations of an involuntary abortion]." *Zhang*, 434 F.3d at 1000 (citation omitted).

Other circuits have similarly relied on the State Department's characterization of the certificates as documentation of voluntary procedures and required corroboration from applicants offering them as evidence of an involuntary abortion. The Eighth Circuit recently upheld an adverse credibility finding in a case where the petitioner presented a certificate as proof of an involuntary abortion: "These inconsistencies are of a substantive nature and go to the key issues in [the petitioner's] asylum claim. [Petitioner] has offered no concrete evidence in support of his testimony regarding the forced enforcement of China's family planning policy in the Fujian Province. Without such evidence, there was reason for the IJ to question the credibility of [petitioner's] testimony about the issue." *Cao v. Gonzales*, 442 F.3d 657, 661 (8th Cir. 2006). Other circuits have also treated the attempt to use the certificates as proof of an involuntary abortion as an inconsistency that the petitioner must affirmatively address. In *Chen v. Gonzales*, 434 F.3d 212, 219 (3d Cir. 2005), the Third Circuit held that an IJ was justified in requiring a petitioner to provide further corroborating evidence of an involuntary abortion where the petitioner offered an "abortion certificate, a document whose authenticity [the IJ] questioned and a document which on its face is silent as to whether the abortion referred to was procured without consent." Most recently, the Second Circuit held that the State Department's profile was compelling, and "constituted a basis for the IJ to have found implausible [petitioner's] testimony that his wife's abortion—as evi-

denced by the certificate—was involuntary." *Lin v. Gonzales*, 446 F.3d 395, 400 (2d Cir. 2006).

As shown in the case law from this and other circuits, the State Department's vague and inconclusive determination as to the validity of these abortion certificates is at odds with the testimony of many asylum applicants from China. But even though the State Department's characterization is not as well-researched or informative as we might wish, it constitutes evidence that such a certificate shows only a voluntary abortion, and that conflict supported the IJ's adverse credibility determination. Although we held in *Dong v. Gonzales*, 421 F.3d 573, 578 (7th Cir. 2005), that "an IJ should not rely on generalized Profiles or Country Reports to refute an applicant's personal experience," the IJ here did not apply "generalized Profiles or Country Reports*." See also Chen v. Ashcroft*, 376 F.3d 215, 225-26 (3d Cir. 2004) (IJ may not reject "the validity of the abortion certificates based on nothing more than the country report"). Rather, the IJ narrowly applied specific information provided in the profile and contrasted it with the petitioner's testimony. Moreover, in *Dong* the IJ's application of the country report was flawed because "[n]either the Profile nor the Country Report rule out the" petitioner's version of events. *Dong*, 421 F.3d at 578. The information in the State Department's profile here regarding the certificates explicitly contradicts Huang's testimony. We conclude, as the Eighth Circuit did in *Cao v. Gonzalez*, that the inconsistency was substantive and that without additional corroborating evidence, the IJ was entitled to find Huang's testimony implausible. *Cao*, 442 F.3d at 661.

We acknowledge that our holding may place applicants in a difficult position, especially since the line between a voluntary and a coerced abortion may sometimes be

blurred.[2] But the contradiction between Huang's characterization of the certificate and the analysis of the State Department casts serious doubts on either the authenticity of the document or its provenance. While this case predated the REAL ID Act and Huang was not required to supply corroborating evidence, *see Diallo v. Gonzales*, 439 F.3d at n.1, the government at argument indicated that an affidavit from Huang's wife would have made his case for asylum much stronger and more sustainable. We concur, and note that the Third Circuit has held that even "using the pre-REAL ID Act standard for reviewing IJ determinations concerning the availability of corroboration," it was reasonable for an IJ to expect some corroborating evidence where an abortion certificate is offered as proof of an involuntary abortion. *Chen*, 434 F.3d at 220. We need not reach the issue of corroboration here; the IJ did not demand any corroborating evidence from Huang, but simply made an adequate credibility determination on the basis of the available evidence.

---

[2] It is undisputed in this and many other cases that China vigorously enforces its "one child" policy. (If the first child is a girl, with some bureaucratic approval the parents may be allowed to have a second child.) However, a mother of a first-born son who is again pregnant may feel compelled to submit to a "voluntary" abortion to avoid being captured later by the cadres and forced to have an abortion. That may be what it takes to obtain a certificate, but to label such an abortion "voluntary" is questionable to say the least. The certificate should at least prove she was pregnant; if she already has a son, one could assume she had no choice but to abort the second baby. Perhaps the affidavit that is missing in this case could set forth a scenario to corroborate what seems to be a Hobson's choice inflicted upon Chinese families.

Huang also argues that the IJ failed to give his case a "particularized review" because it arbitrarily disregarded sections of the State Department and Canadian reports suggesting that forced abortions, while uncommon and prohibited by government policy, do occur. *See Toptchev v. I.N.S.*, 295 F.3d 714, 723 (7th Cir. 2002) (appropriate to take notice of State Department country report as long as Board undertook a particularized review of the case). The BIA must "consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Mansour*, 230 F.3d at 908, *quoting Becerra-Jimenez v. I.N.S.*, 829 F.2d 996, 1000 (10th Cir. 1987). Huang cites *Chitay-Pirir v. I.N.S.*, 169 F.3d 1079, 1081 (7th Cir. 1999), for the additional proposition that the IJ's "interpretation of the evidence should be fully inclusive for an accurate review to result," and contends that this means that the IJ was required to specifically consider and discuss the parts of the reports compatible with his allegations. He asserts that the IJ ignored congruities between his testimony and the reports, and that therefore he did not receive the "particularized review" required by *Toptchev*, 295 F.3d at 723. But in *Chitay-Pirir*, the IJ's serious misunderstanding of the facts and the lack of current information in the record precluded a "discerning judgment" by this court. *Chitay-Pirir*, 169 F.3d at 1081-82. Here, Huang has failed to show that the IJ made any factual errors. He merely asserts that the IJ gave insufficient weight to those parts of the report that are arguably consistent with his testimony. Nor has he shown that the IJ failed to make a "particularized review" of his case. *Toptchev*, 295 F.3d at 723. Here, the IJ's analysis, as adopted by the BIA, shows that it did consider the issues Huang raised, and found cogent and specific reasons, rooted

in the available country reports, to find that his testimony was not credible.

## III.

We hold that the IJ's credibility determination, while partially founded on mere speculation, was ultimately based on substantial evidence in the form of Huang's submission of the abortion certificate. In denying Huang's petition for review, we note that it is not clear what will become of him. Homeland Security Secretary Michael Chertoff recently commented that China's delay in taking back emigrants has created a backlog of some 39,000 Chinese citizens in the United States. *See* Lara Jakes Jordan, *Chertoff: China won't take back deportees*, Associated Press, March 14, 2006; *US says China refuses deportees*, BBC News, March 16, 2006. It is unclear how many Chinese citizens are currently detained in the United States awaiting repatriation. The government was unfortunately unable to clarify matters at oral argument, either as to the size of the backlog or the extent to which it is the result of China's inability or refusal to process such returns. In any event, despite our concerns, there are no "extraordinary circumstances" present in this case that warrant granting Huang's petition for review. *Giday*, 434 F.3d at 550. The petition is therefore

DENIED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*