# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-3951

MENSAH KOFFI ADEKPE

*Petitioner,*

*v.*

ALBERTO R. GONZALES

*Respondent.*

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A95 397 771

ARGUED NOVEMBER 8, 2006—DECIDED MARCH 14, 2007

Before CUDAHY, KANNE, and SYKES, *Circuit Judges.*

CUDAHY, *Circuit Judge.* Mensah Koffi Adekpe petitions for review of a final order of the Board of Immigration Appeals requiring that he be removed to Togo. He argues that the Board, adopting the findings of the Immigration Judge, improperly disbelieved his story of political persecution at the hands of the Togolese government and failed to adequately discuss evidence corroborating his story. We grant the petition and remand the case to the Board.

Adekpe is a citizen of Togo. All agree that Togo is not a good place in which to hold political views adverse to those of the government; as Adekpe's expert witness, anthropologist Dr. Dana Farnham, affirmed, the Togolese govern-

ment "is notorious for its persecution of members of political opposition parties." (We have already heard two appeals of purported Togolese political refugees in the past year. *See Kantoni v. Gonzales*, 461 F.3d 894 (7th Cir. 2006); *Ayi v. Gonzales*, 460 F.3d 876 (7th Cir. 2006).) President Gnassingbe Eyadéma seized power in a military coup in 1967 and continued to rule the country until June of 2005, maintaining effective control over all security forces and using them to suppress dissent. The 2002 State Department Country Report for Togo says that this often involves "serious human rights abuses" (R. at 353), and Farnham confirms that it is common for opposition activists to be "detained, tortured, and even killed" (R. at 345). The record is filled with reports of political killings. While Eyadéma has at times made gestures towards permitting democratic government, they remain only gestures. Power passed to Eyadéma's son Faure Gnassingbe in 2005, but no one contends that government policy has changed.

There is no doubt, then, that many Togolese political activists face persecution for their beliefs. What is in dispute is whether Adekpe is one of them. He entered the United States in August 2001 on a visa that expired on February 18, 2002; he applied for asylum on February 19, 2002. After an interview with a DHS Asylum Officer on March 4, 2004, his application was denied and the DHS commenced removal proceedings against him. Adekpe conceded removability but renewed his application for asylum and added requests for withholding of removal and Convention Against Torture relief.

At his removal hearing, Adekpe testified to a long tale structured around alternating periods of political activism and hiding from subsequent government retribution. His story begins in the city of Lome with his education at the University of Lome's school of management in the late 1980s and early 1990s. He and others founded a student

group called MELD (in French, an acronym for "Student Movement for Liberty and Democracy"), members of which met secretly to carry on discussion and write poetry and tracts about what they thought were various problems facing Togo, including discrimination against students from the south like Adekpe. (The Togolese government exploits an ethnic division between the country's northern half, mostly of Kabye ethnicity, and its southern half, mostly Ewe. President Eyadéma and most of his supporters are Kabye; Adekpe is Ewe.)

MELD was exposed in August 1990 while trying to recruit additional students. One of its members informed the government of its activities. The Gendarmerie, a branch of the Togolese military devoted to internal security, invaded a MELD meeting on the University campus and arrested everyone there. They were taken to a Gendarmerie office, a sort of military camp. While the informer was quickly released, the others were held for two weeks. They all had to stay in a single small room, except for when they were taken one at a time into a different room and interrogated. The interrogators handcuffed the students, shocked them with electricity, and beat them with belts, sticks and boots. Adekpe testified that on the ninth day of his detention he was tied to a table, beaten and shocked; when he tried to fight back afterwards, he fell down from exhaustion and broke four of his front teeth. He didn't receive professional medical attention until after the fourteenth day, when one of Adekpe's professors brought the situation to the attention of an international human rights organization and the MELD students were released.

During roughly the same period in which he was participating in MELD, Adekpe testified, he was also developing a relationship with a Secretary General of the Mayor's Office in Lome (a sort of assistant to the Mayor). Adekpe and the Secretary General lived in the same neighborhood,

and the Secretary General's request for help rearranging his house one day led to frequent social visits with Adekpe. Despite the Secretary General's position in the government, which required loyalty to Eyadéma, these talks eventually turned to politics and it turned out that the Secretary General was in fact an antigovernment sympathizer. His friendship would later turn out to be instrumental in helping Adekpe to avoid apprehension by the military.

MELD disbanded in 1991 when President Eyadéma permitted the creation of opposition political parties. Adekpe joined the Union of Forces of Change (UFC), a large political party that supported democratic reforms, and spent 1991 and 1992 going from town to town to help politically organize young people for demonstrations. (Adekpe's UFC membership card is in the record.) But in 1992 the opposition's activity overwhelmed the government's tolerance for political dissent. The government tried to assassinate Gilchrist Olympio, the head of the UFC, and the military began to break up demonstrations, track their organizers and kidnap participants identifiable in news videos.

Adekpe went into hiding until June of 1993, when French and German dignitaries came to meet with President Eyadéma about a possible restoration of European financial aid. The UFC mobilized for anti-government demonstrations to greet them. On the day of the visit, Adekpe participated in a march that was broken up by the military. Beaten by soldiers, Adekpe fled and stayed hidden when he learned that the government was hunting him as one of the organizers of the march.

In 1994, Adekpe's friend, the Secretary General, informed him that he had been placed on the "black list" of government opponents. Adekpe testified that the list is "a death warrant" and that "as soon as [people on the list] are

taken outside, the military can kill them easily." (R. 194.) Adekpe also met his wife in that year and married her in 1995. He began to hide out in the house of his father-in-law, one Captain Azote. Azote was a member of President Eyadéma's Rally of the Togolese People party (RPT) with a high-ranking position in the Togolese military, but was also, like the Secretary General, an opposition sympathizer.

Adekpe testified that his marriage to Azote's daughter led to Azote's death. President Eyadéma himself made a telephone call to Azote in which he inquired about the political affiliation of Azote, his wife and his daughter (though Eyadéma did not mention Adekpe). Azote responded that "in his house, all were free to do as they wanted." (R. 196.) After this conversation, Azote began to fear that forces were organizing against him within the military. On January 29, 1996, suffering from nervous insomnia, he took a walk at about 3:00 to 4:00 in the morning. Soldiers stopped him on the street, took his identification and sidearm, let him go and then shot him in the back.

The Secretary General warned Adekpe not to remain in Lome, and he and his wife fled to Notse, a town about two hours away. There they stayed with a friend of the Secretary General until June of 1998. Adekpe's wife gave birth to a daughter and the couple performed farm work for their host.

In June of 1997 the UFC decided to participate in upcoming European Union-financed national elections. While trying to keep a low profile, Adekpe traveled to several villages near Notse to mobilize voters. On election day, June 21, 1998, Adekpe served as a UFC representative at the Notse voting office. A "representative" fills a role something like that of an election judge in the United States, supervising voting and tabulating the votes after

the polls close. As the returns began to come in, however, the government's temporary tolerance of the opposition again came to an end. The polls closed at 6:00 p.m.; two hours later elements of Eyadéma's RPT came and told the representatives to stop tabulating the votes. The non-RPT representatives continued to tabulate votes anyway, but became concerned about "suspicious movements" in the courtyard of the school that served as the polling place; so they signed a report on the vote totals and fled. Rumors quickly spread that the government was kidnaping members of the opposition again; so Adekpe's host immediately drove him and his family south to the village of Alfao-Totche.

Adekpe hid out in Aflao-Totche. He found work as a mathematics teacher in October of 1999, but had to quit in May 2000. He learned from the Secretary General that the military suspected where he was and someone showed up at the school to ask Adekpe's boss about him (with his boss telling the inquirer that Adekpe had quit weeks earlier). In 2000, the Secretary General helped to get Adekpe a passport, which Adekpe picked up at the Secretary General's house in Lome. On occasion, Adekpe crossed a border into Ghana near Aflao-Totche.

In 2001 Adekpe received a United States visa to participate in a poetry conference (having been recognized on the basis of a poetry contest to which he had submitted poems via the internet in Ghana). Adekpe testified that on August 18, 2001, he "slipped through the border" to Ghana and traveled from there to the United States. When the DHS pointed out that there was an August 18 Ghana entry stamp in Adekpe's passport, Adekpe clarified that he meant he had traveled across a relatively isolated border station near Aflao-Totche rather than across a more heavily-traveled border where he would be more likely to be stopped for being on the "black list."

Since leaving Togo, Adekpe has received communications from his family, both letters (translations of which are in the record) and telephone calls occasionally placed to him by his wife from Ghana. These continue to tell the story of government harassment. Adekpe's wife reported that in late 2001 people kept coming to her house to ask where Adekpe was, and, when she admitted that he was in the United States, the date he was expected back. On April 3, 2002, in an incident also mentioned in a letter from Adekpe's brother, a stranger showed up at Adekpe's daughter's school, claiming to school officials to be a family friend and attempting to take her home. Adekpe's family suspected he was from the military and the family fled to live with Adekpe's mother. Adekpe's daughter has still not returned to school out of fear of the military.

On cross-examination, the DHS drew attention to conflicts between Adekpe's hearing testimony and accounts he had given in his application for asylum, in his interview with an asylum officer (as evidenced by the officer's notes) and in an affidavit. Adekpe tried to explain the omission of some details from his application and interview, in part by claiming that he didn't know he was supposed to be precise about the details of his story on the application, that he thought the application was supposed to be only a summary and that the translator he brought to his asylum interview was not very skilled and plainly had difficulty with the translation.

The IJ denied Adekpe's requests for relief. She did not believe his story, largely because of various discrepancies between Adekpe's testimony and earlier versions of his account. She noted, for instance, that while Adekpe's testimony made it seem that his father-in-law, Captain Azote, was killed because of his daughter's marriage to Adekpe, Adekpe's asylum application indicated that Azote was killed for being a dissident in his own right. The application also states that Azote was shot down on

January 27 rather than on January 29 and during the course of a normal morning jog rather than in the course of an insomniac wandering. The IJ also pointed out that Adekpe had changed his story with respect to how many members MELD had, how many of them were arrested and whether or not the informant member was arrested or released.

The IJ also disbelieved Adekpe because his hearing testimony included details omitted from his previous versions of his story. Most significantly, prior to the hearing, Adekpe had failed to mention his friendship with the Secretary General of the Mayor's Office in Lome, although Adekpe had mentioned that a "friend" helped him to get his passport. Adekpe explained that he had not mentioned the Secretary General in his asylum application because he believed it was only a summary and because he was afraid that by mentioning the Secretary General's name he would put his life in danger. His application also failed to mention, among other things, his involvement in the 1998 elections, the electric shocks during the MELD detention and some of the times when he went into hiding.

Finding that Adekpe's testimony was not credible, the IJ turned to the evidence offered to corroborate it. She acknowledged that Adekpe had provided a copy of his UFC membership card and letters from his family, but nonetheless found that these did not help Adekpe because they did not "specifically corroborate" his story, that is, because they did not "corroborate the incidents that occurred specifically to him":

> The letter from the Respondent's mother-in-law does not corroborate that her husband was killed. The letters from the Respondent's mother and brother do not corroborate that the Respondent was detained for 14 days and beaten in 1990. The letters from his

wife do not corroborate the Respondent's involvement in the UFC or his participation in the 1998 election as a UFC representative. As such the Respondent failed to corroborate the specific elements of his asylum claim. (App. at 56.)

Because the IJ disbelieved Adekpe's story, she held that he was not eligible for any of the requested relief from removal. Adekpe appealed to the BIA, which affirmed without opinion, adopting the IJ's opinion as its final determination per 8 C.F.R. § 1003.1(e)(4). Adekpe now petitions for review, challenging the denial of all three forms of relief.

We must affirm the IJ's decision unless it is not supported by substantial evidence, 8 U.S.C. § 1252(b)(4)(B); *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992), or unless the IJ ignored probative evidence, an important possible inference or otherwise failed to make a reasoned analysis of the evidence before her as a whole, *Apouviepseakoda v. Gonzales*, 475 F.3d 881, 890 (7th Cir. 2007); *Hanaj v. Gonzales*, 446 F.3d 694, 700 (7th Cir. 2006); *Iao v. Gonzales*, 400 F.3d 530, 533 (7th Cir. 2005). To show that he is entitled to asylum, withholding of removal or CAT relief, Adekpe must show at a minimum that he is unable or unwilling to return to Togo because of persecution or a well-founded fear of persecution on account of a political opinion, 8 U.S.C. §§ 1101(a)(42)(A) & 1158(b)(1)(A) (discussing asylum); *see also* 8 U.S.C. § 1231(b)(3)(A); *INS v. Stevic*, 467 U.S. 407, 424-25 (1984) (holding that the standard for withholding of removal is more demanding than the standard for asylum), or that he would more likely than not be tortured if returned to Togo, 8 C.F.R. §§ 208.16(c)(2) & 208.18(b)(1). In the present case, the IJ denied relief not because Adekpe's alleged sufferings and fears did not rise to the level of persecution or torture, but because she found his story incredible. Such a finding must be made with reference to specific, cogent reasons

that bear a legitimate nexus to the finding, and that go to
the heart of an applicant's claim, rather than to a minor,
irrelevant aspect of the story. *Giday v. Gonzales*, 434 F.3d
543, 550 (7th Cir. 2006); *Rodriguez-Galicia v. Gonzales*,
422 F.3d 529, 537 (7th Cir. 2005).

In the present case, the IJ's decision to discredit
Adekpe's story was not based on a reasoned analysis of the
evidence as a whole. Her decision to discredit Adekpe's
testimony was based largely on unimportant discrepancies
between it and earlier versions of his story regarding
subjects that were not very relevant to Adekpe's alleged
reasons to fear returning to Togo. Even if her analysis of
Adekpe's testimony were sufficiently sound, she failed to
rationally consider how letters from Adekpe's family
describing its current situation in Togo might support
his story.

We address the discrepancies in Adekpe's testimony
first. Inconsistencies between an alien's hearing testi-
mony and earlier statements, and omissions from those
earlier statements, can support an adverse credibility
finding. But they can do so only where they go to the heart
of the asylum applicant's claim, rather than when they
concern minor and relatively immaterial points in the
applicant's testimony, *Rodriguez-Galicia*, 422 F.3d at 537;
*Capric v. Ashcroft*, 355 F.3d 1075, 1090 (7th Cir. 2004);
*Uwase v. Ashcroft*, 349 F.3d 1039, 1043 (7th Cir. 2003).
Further, the contradiction or omission must be substan-
tive, and not easily explained or superficial. *Giday*, 434
F.3d at 551-52. Even if some of the discrepancies on which
the IJ relies to support a credibility determination do
concern the heart of the alien's claims, we must still
remand for reconsideration where the vast majority of the
reasons relied upon are immaterial. *Giday*, 434 F.3d at 553
("[I]t seems unlikely that the immigration judge would
make the same credibility determination based on one

inconsistency rather than the four he originally noted."); *Georgis v. Ashcroft*, 328 F.3d 962, 970 (7th Cir. 2003) (remanding where only one of the six reasons the IJ relied upon was material), *but see Korniejew v. Ashcroft*, 371 F.3d 377, 386 (7th Cir. 2004) (affirming where two of three reasons were material).

The majority of the discrepancies the IJ relied upon to discredit Adekpe's testimony concerned minor, immaterial parts of his testimony. Two discrepancies were arguably important—the failure to mention the Secretary General, a somewhat central character in Adekpe's story whose friendship explains why Adekpe was able to stay ahead of the government for so long, and the contradiction concerning the reason for Captain Azote's murder—but the vast majority were unimportant. To begin with, the central point of Adekpe's testimony about his activities with MELD, for purposes of his claims here, is that he was detained and beaten for his political activities. The points upon which the IJ noted discrepancies—whether the meeting occurred on campus or "at home" (assuming that represents a distinction for a university student), whether the meeting had 13 or 20 participants, what precisely happened to the informant—do not concern this basic core. *Korniejew*, 371 F.3d at 383; *Uwase*, 349 F.3d at 1042-43. Additionally, Adekpe failed to mention the electrical shocks on his asylum application, but we find it doubtful that the DHS would deny asylum to the victim of a politically motivated, two-week detention filled with deliberate, vicious beatings but grant it to a similar applicant with additional nonlethal electrical shocks; pain is pain, whether inflicted with or without technological sophistication. *Giday*, 434 F.3d at 552. The discrepancies regarding Captain Azote's assassination, with the exception of those dealing with the motivation for the killing, are similarly unimportant. If Azote was killed for his association with Adekpe, it suggests that the government

would likely kill Adekpe too, if given the chance, regardless of whether Azote was killed on a Monday or Saturday, walking or jogging. *Kllokoqi v. Gonzales*, 439 F.3d 336, 341-42 (7th Cir. 2005) (holding that minor discrepancies in the date of an alien's graduation from high school as compared to the date of a beating did not justify an adverse credibility finding). Finally, the IJ found it unreasonable that Adekpe would omit to mention long periods of time spent in hiding and his participation in the 1998 elections on his asylum application, but we are not as certain. Adekpe testified that he thought the application was a summary. The IJ's opinion does not offer any reason to disbelieve that testimony, and the events omitted were comparatively minor. Adekpe was beaten before he went into hiding after the foreign dignitary visit in 1993, but by and large the omitted events involve the government trying and *failing* to hurt Adekpe and his associates, rather than the government's successes in arresting the MELD students in 1991 and killing Captain Azote in 1995. If Adekpe genuinely believed the application was supposed to be a summary, those omissions make sense. *Cf. Shmyhelskyy v. Gonzales*, ___ F.3d ___, No. 06-1550, 2007 WL 475829, *7 (7th Cir. Feb. 15, 2007) (affirming an adverse credibility determination against an alien based on that alien's failure to mention the most vicious beating he received before the asylum hearing). Because the IJ's credibility determination relied in such large part on unimportant and explicable discrepancies, we must remand for reconsideration.

Second, the IJ failed to consider the obvious implications of the letters Adekpe presented from members of his family still in Togo. Even if the IJ had properly considered Adekpe's testimony incredible on its own, other evidence, including these letters, could still bolster his story. *Uwase*, 349 F.3d at 1041. The letters report that after Adekpe's departure, his wife and child faced harass-

ment and danger from the Togolese military. The government points out that some portions of the letters are ambiguous and could indicate mere economic misfortune; for instance, Adekpe's mother writes that "[s]ince you left, the situation that made you leave has not ceased," and refers to financial difficulties. (R. 444.) But at other points it is quite clear that the "situation" is the government's pursuit of Adekpe. In that same letter Adekpe's mother says that if Adekpe's family does not leave Togo "they will surely end up being arrested, never to be seen again." (*Id.*) Adekpe's brother writes that "[t]he military continues to harass and threaten" and that "they made an attempt to kidnap your daughter"; he tells Adekpe that if he does not bring his family to America, "it's hard to tell what will happen with the militia's threats." (R. 445.) Finally, Adekpe's wife herself informs him that he is the cause of the trouble: "As I am writing you, people are informing me that [they] are relentless in their efforts to obtain information about you, your wife and your daughter." (R. 455.)

The IJ dismissed these letters because they failed to mention events from Adekpe's narrative that occurred prior to his departure from Togo, such as his work with MELD and the UFC or the murder of Captain Azote. It is perhaps true that Adekpe's story might be more plausible if the letters had confirmed details of these events. (On the other hand, as Adekpe observes, it might be suspicious for a letter to without solicitation recount stories that are several years old and with which the recipient is more familiar than the writer.)

But while the IJ was correct to conclude that the letters did not "specifically corroborate" Adekpe's testimony in that way, she ignored a way in which the letters might make Adekpe's story more plausible without specifically corroborating its details: by revealing that the situation in Togo after his departure is consistent with the situation

he says existed prior to his departure. *See Balogun v. Ashcroft*, 374 F.3d 492, 507 (7th Cir. 2004) (holding that a letter from an alien's mother stating that elders were asking when the alien would return to undergo female genital mutilation corroborated the alien's story that she had been pressured to undergo female genital mutilation). It is undisputed that Togo frequently persecutes important members of opposition parties like the UFC, and (despite the government's observation that no one has translated Adekpe's UFC membership card from French to English) no one has seriously disputed that Adekpe is a card-carrying member of the UFC. True, Togo does not persecute *every* member of an opposition political party; many Togolese can become rank-and-file members of opposition parties without facing severe repercussions. *Eusebio v. Ashcroft*, 361 F.3d 1088, 1092 (8th Cir. 2004). But Adekpe does not claim he is a rank-and-file member of the UFC; he claims that he is a relatively important member who has organized demonstrations and served as a party official during an election. Essential to the credibility of Adekpe's claim of persecution, therefore, is the credibility of his claim that he is a sufficiently important member of the UFC to warrant the government's attentions. Evidence that the Togolese government pursued Adekpe and threatened his family after he left Togo suggests that he is sufficiently important. No one has suggested another reason why the government might chase Adekpe, and the record confirms that the current government inquiries are consistent with his having been persecuted; Dr. Farnham affirmed that "[r]efugees who fled Togo due to fear of reprisal for their political activities have been particularly targeted by the Togolese security forces upon their return." (R. 345.)

By letting her analysis of the letters from Adekpe's family rest with a determination that they did not "specifically corroborate" his testimony, the IJ acted as though

there were two distinct stories: Adekpe's tale, covering the years 1990 to 2001 and alleging various government punishments and threats caused by Adekpe's political opinions, and Adekpe's family's tale, covering the years after 2001 and alleging that the government is harassing Adekpe's wife about his whereabouts, has tried to kidnap Adekpe's daughter and has driven his family into hiding—all for reasons unknown. In so doing, the IJ failed to consider the evidence as it most plausibly fits together as a whole. *Cecaj v. Gonzales*, 440 F.3d 897, 899 (7th Cir. 2006). If the government has continued to harass Adekpe's family and has sought his whereabouts after 2001, it is probably because of his political work with the UFC. If the IJ credits the letters, they should make Adekpe's claims that the government harassed, threatened, detained and beat him for his work with MELD and UFC prior to 2001 much more plausible.

Because the IJ failed to rationally consider the evidence as a whole, we grant Adekpe's petition for review and remand the case to the BIA. On remand, the IJ must consider the letters, evaluate their credibility and evaluate Adekpe's story in light of the evidence as a whole, giving consideration to the possible inferences described above. The IJ must also confine its consideration of the contradictions and omissions in various versions of Adekpe's story to those concerning facts central to his claim.

A true Copy:

     Teste:

 

       _____

       *Clerk of the United States Court of*
       *Appeals for the Seventh Circuit*