NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted December 12, 2007[*]
Decided January 31, 2008

**Before**

Hon. WILLIAM J. BAUER, *Circuit Judge*

Hon. DANIEL A. MANION, *Circuit Judge*

Hon. ILANA DIAMOND ROVNER, *Circuit Judge*

No. 06-3541

| | |
|---|---|
| SHU QIN QU, | Petition for Review of an Order of |
| *Petitioner,* | the Board of Immigration Appeals |
| | |
| *v.* | No. A78 865 469 |
| | |
| MICHAEL B. MUKASEY, Attorney | |
| General of the United States, | |
| *Respondent.* | |

**O R D E R**

Shu Qin Qu, a native and citizen of the People's Republic of China, arrived at Chicago's O'Hare airport without documentation. After she was detained and placed in removal proceedings, she applied for asylum, withholding of removal, and relief under the Convention Against Torture (CAT), contending that she would suffer persecution and torture in China because Chinese authorities believe she is a member of Falun Gong. The immigration courts denied her application because

---

[*] On December 10, 2007, we granted the petitioner's motion to waive oral argument. Therefore, the petition for review is submitted on the briefs and the record. *See* Fed. R. App. P. 34(f).

they found her not credible and thus unable to establish a well-founded fear of future persecution or to meet the higher burdens for withholding of removal and CAT relief. But the reasons that the Immigration Judge (IJ) gave for disbelieving Qu were not based on evidence in the record. We therefore grant Qu's petition.

Qu, who is 52, attempted to enter the United States at Chicago in July 2002. Because she did not have travel documents, she was detained at the airport. Qu requested asylum during her airport interview, which was conducted by an English-speaking officer with assistance from a Mandarin interpreter participating by telephone. The former INS charged Qu with removability, which Qu conceded. But in her application for asylum and related relief, Qu claimed that if returned to China she would be persecuted and tortured because, she contended, the Chinese government mistakenly believes she is a member of Falun Gong, an organization banned in China.

At Qu's removal hearing she testified that on June 26, 2002, she joined a group that practiced Zhonghua Jianshen Gong, an exercise regimen that Qu believes improves her health and eases her sleeping problems. On July 1, her instructor, Sister Wei, asked her to distribute CDs containing information about the exercise regimen. Qu agreed, and on July 2, she placed the discs where passersby could see them and handed a few directly to people on the street. The next morning, July 3, while she and six others, including Sister Wei, were practicing the exercise regimen, six or seven police officers approached them, accused them of practicing Falun Gong, arrested them, and took them to the police station. At the police station, Qu was interrogated about her alleged Falun Gong activities. Qu testified that the officers kicked her in the legs and forced her to kneel. She told the officers that she did not practice Falun Gong, but they did not believe her.

Qu also testified that she saw the officers interrogate Sister Wei. For 40 minutes they slapped, punched, and kicked Wei and beat her with an electric baton. After the beating, Wei confessed to practicing Falun Gong. After hearing Wei's confession, Qu fainted, and when she regained consciousness, the officers coerced her into confessing that she, too, practiced Falun Gong. Qu testified that, in fact, she has never been a member of Falun Gong, nor does she know anything about its beliefs or practices.

Qu next told the IJ that, after she falsely confessed, the officers put her in a small room by herself. She testified that around midnight, she complained of stomach pains and asked to use the bathroom. She stayed in the bathroom until she could not hear anything outside the door. She opened the door quietly, removed her shoes, snuck past two sleeping guards, and escaped. She then fled to a friend's house and stayed there for five days. Next, she went to a relative's house, where she remained for about four days. She testified that a friend then helped her travel

to the airport in Beijing where she boarded a flight to Chicago. She explained that she was able to get on the plane without travel documents because a friend arranged for a man, who was dressed in a police uniform but whom she did not know, to escort her past security.

Qu then testified that at least one person arrested with her was sent to a reeducation camp as punishment for alleged membership in Falun Gong. She went on to say that Chinese authorities monitor her family, and that they once summoned her husband to the police station and asked him to provide information on her whereabouts.

Qu submitted several documents in support of her application. She provided a translated copy of her birth certificate, which is dated July 1, 2002. The translation was notarized by a Chinese official, and in October 2002—after Qu's arrival in the United States— this notarized translation was certified by the U.S. consulate in accordance with the procedures in 8 C.F.R. § 287.6. Qu also submitted a copy of her marriage certificate; a letter from her husband; the summons her husband claims he received from Chinese authorities; a letter from the friend who took her in after her escape; and a letter from the woman Qu says was arrested with her and sent to a reeducation camp, accompanied by a copy of what purports to be her notice of release from the camp.

The IJ also admitted into evidence, over Qu's objection, the transcript of Qu's airport interview. The government's attorney pointed out on cross-examination that, according to the transcript, Qu stated during the interview that she was arrested on July 1, not July 3, as she had testified. Qu maintained that the interviewer did not ask her about specific dates and that she told the interviewer she was arrested in "early July," not specifically on July 1. She also testified that she understood "some parts" of the interviewer's questions, but was confused during the interview and did not always understand the interpreter.

The government's lawyer then asked Qu about the documents she submitted. Qu testified that she did not bring any documents with her to the United States. She also explained that in 2000, when she was 45, she retired early in exchange for a "lump-sum" buy-out payment from her employer. The amount of the payment was based on the number of years she had worked. She said that the employer's insurance company was responsible for making the payment and that it needed to verify her identity and birth date before it would pay her. To comply with the insurance company's request, she obtained a copy of her birth certificate in July 2002.

The government's attorney then asked her to explain why the Chinese government would notarize her birth certificate after she became a fugitive. She

responded that the government department that notarizes documents is separate from the department that is searching for her. When asked who brought the birth certificate to be certified, Qu answered that, because the authorities are monitoring her husband, a friend might have done it. As for the other documents, Qu testified that she did not request or receive them directly; her attorney obtained them and sent them to her. Qu did not clarify which attorney compiled the documents (she was represented by two attorneys during the course of her proceedings before the IJ and is represented by a third counsel in this court), but certified translations of envelopes in the record show that Qu's husband and friends mailed at least some of the documents directly to the attorney who represented Qu at the hearing.

Finally, the IJ asked Qu about her parole from DHS custody. The record does not reflect the conditions of her parole, but she must have been released sometime before September 2002, because she notified immigration authorities that she would be changing her address from California, where the person who sponsored her parole lives, to Illinois effective September 1, 2002. From the IJ's questions and Qu's testimony, it appears that Hau Yuan Lu sponsored her parole and that he agreed she would live with him in California once she was released. But Qu testified that Lu is her husband's friend and that she does not keep in touch with him. She also testified that she never lived in California; instead, after her release from custody, she stayed in Chicago, where she knew no one, and found an apartment in Chinatown and a job at a Chinese restaurant.

The IJ denied Qu's application and ordered her removed. The IJ found Qu not credible because (1) her testimony that she was arrested on July 3 contradicted her statement during the airport interview that the arrest occurred on July 1; (2) she did not explain satisfactorily why she was able to get her birth certificate, but not her other corroborating documents, certified by a consular official; (3) it was implausible that she could "tip toe" out of detention; (4) it was unlikely that Chinese authorities would notarize her birth certificate while they were actively trying to find her; (5) it was suspect that Qu obtained her birth certificate on July 1, just two days before her alleged arrest and 19 days before she left China; (6) she "does not know" the person who sponsored her release from DHS custody and lied about her intention to live with him in California, calling into question her reason for coming to the United States; and (7) a country report that warned of a high rate of forgeries among documents purportedly issued by Chinese officials raised suspicion about the authenticity of Qu's documents. The IJ then denied Qu relief, reasoning that Qu had not established a well-founded fear of future persecution. The IJ based her decision entirely on her finding that Qu was not credible and did not analyze whether, if true, Qu's testimony would establish that she has a well-founded fear of future persecution in China.

The BIA adopted and affirmed the IJ's decision, but added a brief statement of its own, so we examine the IJ's written opinion as supplemented by the BIA. *See Gjerazi v. Gonzales*, 435 F.3d 800, 807 (7th Cir. 2006). In her petition for review, Qu first argues that the IJ's adverse credibility finding is not supported by evidence in the record. She also argues that the IJ violated her right to due process by allowing the government to enter into evidence the transcript of her airport interview. We address Qu's arguments in reverse order.

Qu contends that she was denied due process when the IJ admitted into evidence the transcript of her airport interview without giving her the opportunity to cross-examine the interviewer and the interpreter. Qu did not raise this argument before the BIA, so she has failed to exhaust her administrative remedies. Thus, she has waived the argument. *See Alimi v. Gonzales*, 489 F.3d 829, 834 (7th Cir. 2007); *Capric v. Ashcroft*, 355 F.3d 1075, 1087 (7th Cir. 2004). In any event, it was proper for the IJ to admit the statement. An IJ may consider evidence as long as it is probative and its admission is "fundamentally fair." *Doumbia v. Gonzales*, 472 F.3d 957, 962 (7th Cir. 2007). We have sanctioned the admission of airport statements that are reliable, *see Jamal-Daoud v. Gonzales*, 403 F.3d 918, 923 (7th Cir. 2005), and Qu does not contest the reliability of her airport statement. Instead she essentially argues that there was a misunderstanding at the interview that led to an inaccuracy in the transcript. But Qu had a full opportunity to explain this discrepancy to the IJ. By claiming an isolated inaccuracy she does not make an otherwise reliable statement inadmissible.

Qu's primary argument in her petition for review is that the IJ's credibility finding is not supported in the record. We give an IJ's credibility determination a high degree of deference. *Shmyhelskyy v. Gonzales*, 477 F.3d 474, 479 (7th Cir. 2007). Even if we might have weighed an applicant's credibility differently, we will uphold the IJ's adverse credibility finding unless the record compels the conclusion that the finding is not supported by substantial evidence. *See id.* at 478; *Giday v. Gonzales*, 434 F.3d 543, 553 (7th Cir. 2006); *Feto v. Gonzales*, 433 F.3d 907, 912 (7th Cir. 2006).[1] The IJ's conclusion, however, must not be based on easily explained discrepancies. *See Adekpe v. Gonzales*, 480 F.3d 525, 531 (7th Cir. 2007). They must be supported by specific, cogent reasons that bear a legitimate nexus to the determination. *See Giday*, 434 F.3d at 550. Minor discrepancies that do not go to

---

[1] Because Qu petitioned for asylum in 2002, her case is not affected by the revised credibility standards of the REAL ID Act of 2005. *See* Pub. L. No. 109-13, 119 Stat. 231. The new standards apply only to petitions for asylum made on or after May 11, 2005. *Id.* at § 101(h)(2). *See also Diallo v. Gonzales*, 439 F.3d at 765 n.l (7th Cir. 2006); *Dawoud v. Gonzales*, 424 F.3d 608, 613 (7th Cir. 2005).

the heart of the alien's claim will not support an adverse credibility finding. *See Adekpe*, 480 F.3d at 531.

The IJ concluded that Qu's explanation for coming to the United States was not genuine, but the reasons the IJ gave for disbelieving her are not supported by substantial evidence. Although some of the details of Qu's arrest, escape, and flight are unusual, the IJ was required to base her credibility finding on something more than her own speculation about the uniqueness of Qu's situation. First, the IJ did not address adequately Qu's explanation for the discrepancy between her testimony and the transcript of her airport interview concerning the date she was arrested in China. *See Adepke*, 480 F.3d at 531; *Giday*, 434 F.3d at 551. Qu testified that, at the airport interview, she had difficulty understanding all of the questions. Further, she explained that she told the interviewer that she was arrested in "early July," but did not provide a specific date. The IJ did not support with any analysis her conclusion that Qu's explanation was "unavailing." We repeatedly have admonished IJs to be sensitive to the possibility of misunderstandings caused by the use of translators. *See Iao v. Gonzales*, 400 F.3d 530, 534 (7th Cir. 2005) (collecting cases). Furthermore, as Qu points out, it is not clear that there is a discrepancy at all. At the interview, Qu summarized her version of events, then the interviewer asked, "When did this happen, when did you escape?" Even if the transcript is accurate, Qu's recorded response, "July 1," could be an answer to the first question, since she testified that she agreed to hand out CDs on July 1. The IJ improperly found Qu's testimony not credible, at most, based upon an easily explained discrepancy. *See Adekpe*, 480 F.3d at 531.

Next, the IJ thought it implausible that Qu could have escaped in the middle of the night from a "prison which was guarded around the clock by several policemen," but again the IJ offered no support in the record for this belief. Qu testified that she was detained and interrogated in a "room" in a police station, not a jail cell in a heavily guarded prison. Nothing in the record establishes how secure the police station was or how many guards were responsible for supervising the detainees. The IJ's speculation, without more, is not substantial evidence on which she may base an adverse credibility finding. *See Jiang v. Gonzales*, 485 F.3d 992, 995 (7th Cir. 2007); *Huang v. Gonzales*, 453 F.3d 942, 945 (7th Cir. 2006). And Qu's story—that she escaped from the bathroom of a police station in the middle of the night while the guards were sleeping—is not so implausible that we can overlook the lack of support for the IJ's conclusion. *See Shtaro v. Gonzales*, 435 F.3d 711, 715 (7th Cir. 2006).

The date of Qu's birth certificate made the IJ suspicious of Qu's testimony that she fled China out of fear of persecution. The birth certificate is dated just two days before her purported arrest and just 19 days before she came to the United States. And the IJ was unpersuaded by Qu's explanation that she needed the birth

certificate to receive a buy-out payment from her former employer, reasoning that the employer would not have waited two years before paying her and would not have needed proof of her identity. Although the date the birth certificate was issued certainly raises a question as to whether Qu came to the United States as a result of her arrest or planned the trip in advance, the IJ mischaracterized Qu's testimony and did not provide an appropriate reason for not believing her explanation. Qu testified that she needed the birth certificate to prove her birth date as well as her identity to her former employer's insurance company—not to the former employer. It is hardly surprising that the insurance company would demand proof of identity before paying out a substantial sum, and the company might also have needed to verify that Qu had reached a certain age before disbursing retirement benefits. Furthermore, the IJ's suspicion that Qu obtained the birth certificate in anticipation of her travel to the United States is undercut by the fact that she did not bring the birth certificate with her; the birth certificate was not translated, notarized, and certified in China until three months after it was issued and Qu arrived in the United States.

The IJ also found suspicious that a Chinese official in Qu's hometown, Tieling, would notarize her birth certificate after she escaped from custody and while the government was pursuing her. But Qu explained that the officials who notarize documents operate separately from those who were searching for her, so having a document notarized would not necessarily tip off enforcement officials. No evidence in the record undercuts Qu's explanation or supports the IJ's speculation about the level of coordination within the Chinese government bureaucracy. Tieling has a population of nearly 400,000, *see* http://www.citypopulation.de/China-Liaoning.html*, and it is reasonable to think that notaries in a city of that size would not know whether an individual asking for a notarial certificate is a fugitive or the friend or relative of a fugitive. Moreover, Qu's explanation did not, as the IJ asserted, "contradict" her testimony that a friend may have gotten the document notarized and certified. The two statements are not contradictory. A friend very well could have gotten the document notarized by an official who had nothing to do with the search for Qu.

The IJ also doubted the authenticity of other supporting documents. She found significant that Qu did not have these documents certified by the U.S. consulate. *See* 8 C.F.R. § 287.6(b)(2). But Qu's failure to get these documents certified does not prove that they are forgeries. *See Shtaro*, 435 F.3d at 717. It is rare for an asylum applicant to submit certified documents, and the use of non-certified documents does not automatically doom a claim. In any event, a certification establishes only that a particular foreign official had the authority to sign the document. It does not prove that the document is authentic. The government easily could have determined the authenticity of Qu's documents by obtaining a forensic evaluation, which it often does if fraud is suspected, *see, e.g.*,

*Doumbia*, 472 F.3d at 962-63, but it chose not to do so here. And although the IJ also thought the lack of certification was troubling in light of the care Qu took in having her birth certificate certified, there is no reason to believe that it would have been just as easy to get the other documents certified. The marriage certificate might be on par with Qu's birth certificate, but it seems a stretch to assume, as the IJ did, that Qu's husband and friend could go back to the police station and reeducation camp to request notarized copies of their respective documents for certification by a consular official. Moreover, 8 C.F.R. § 287.6 describes procedures for certifying only *official* records, and the IJ does not explain her further assumption that Qu could have had the letters from her husband and friends certified.

The IJ also questioned the authenticity of Qu's documents because she found implausible Qu's statement that her attorney obtained them without her knowledge or assistance. But the IJ's conclusion is speculative and has no support in the record. It is quite possible that Qu provided the biographical and contact information necessary for her attorney to reach out to her friends and husband. It is also possible that her attorney did not communicate with her regularly to tell her about the documents he was compiling. And copies of the envelopes show that Qu's husband and friends mailed their letters directly to the attorney who represented Qu at her hearing. If the IJ really was doubtful about Qu's testimony, she could have asked counsel for clarification at the removal hearing instead of raising the concern for the first time in her written decision.

The IJ also based her skepticism of Qu's documents on a passage in a country report stating that fabrication of official Chinese documents is common. Although an IJ may compare specific information in a country report with the alien's version of events, *see Huang*, 453 F.3d at 947, she may not rely on general statements to disprove an alien's particular experience, *see Zhang v. Gonzales*, 434 F.3d 993, 1000 (7th Cir. 2006); *Dong v. Gonzales*, 421 F.3d 573, 578 (7th Cir. 2005). Here, the IJ improperly based her conclusions about the authenticity of Qu's particular documents on a generalization about some types of Chinese documents. The red flag raised by the country report might have given the IJ a basis for seeking a forensic evaluation, *see* 8 U.S.C. § 1229a(b)(1) (authorizing IJ to subpoena evidence), but the report itself was not evidence that Qu's particular documents were fakes.

The IJ's final reason for no believing Qu—that she lied to secure her parole—does have support in the record, but this lie does not undermine Qu's testimony that she fled China because she fears persecution. The IJ found the circumstances surrounding Qu's parole disturbing because, the IJ concluded, Qu did not know Lu, the person who sponsored her release on parole. At the hearing, the IJ was troubled because "she's claiming she has no idea who this Mr. Lu is, and yet he steps forward and secures her release, leading me to believe this was all prearranged

and she got caught." Qu, though, did not testify that Lu was a stranger; rather, she said that he "was a friend through my husband in China" whom she "didn't really keep contact" with. Relatedly, the IJ observed that Qu lied to immigration officials about her intention to live with Lu in California. Although this lie may raise concerns about her credibility generally, providing a false address to U.S. immigration officials has nothing to do with the reason she left China. And her duplicity in securing parole in the United States does not seem to go to the heart of her asylum claim. *See Adekpe*, 480 F.2d at 531 (holding that IJ must base adverse credibility finding on issues that go to heart of asylum claim).

Even though Qu's lie to secure her parole has some support in the record, it does not discredit Qu's testimony as much as the IJ presumes. And since the majority of the reasons the IJ gave for disbelieving Qu were not based on substantial evidence, we grant Qu's petition for review and remand to the BIA. *See Adekpe*, 480 F.3d at 531 (remanding where "vast majority" of IJ's reasons based on easily explained discrepancies or did not go to heart of claim); *Kwok v. Gonzales*, 455 F.3d 766, 772 (7th Cir. 2006) (remanding where most of the IJ's reasons were unsupported "even though the IJ identified at least one potentially serious inconsistency")*; Giday*, 434 F.3d at 553 (remanding when three out of the four inconsistencies the IJ found were not material); *Shtaro*, 435 F.3d at 717 (remanding where only on of the IJ's findings might go to alien's credibility); *Ssali v. Gonzales*, 424 F.3d 556, 564 (7th Cir. 2005) (same); *Georgis v. Ashcroft*, 328 F.3d 962, 970 (7th Cir. 2003) (same); *but see Huang*, 453 F.3d at 948 (upholding adverse credibility finding where some reasons were not based on substantial evidence but others provided sufficient basis for finding).

In granting the petition we express no opinion about the merits of Qu's application. We urge the BIA first to reevaluate whether Qu's testimony is credible and then to analyze whether she has a well-founded fear of future persecution in China.

GRANTED.